Lisa J. Ludwig (Oregon Bar No. 953387)
Lisa@l2r2law.com
LUDWIG RUNSTEIN LLC
The Gilbert Building
333 SW Taylor St. Suite 300
Portland, Oregon 97204
(503) 223-5570
*Attorney for Plaintiffs*

J. Morgan Philpot (Oregon Bar No. 144811)
morgan@jmphilpot.com
JM PHILPOT LAW, PLLC
1063 East Alpine Drive
Alpine, UT 84004
(801) 428-2000
*Attorney for Plaintiff (Active Status Pending)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| D. JEANETTE FINICUM; THARA TENNEY; TIERRA COLLIER; ROBERT FINICUM; TAWNY CRANE; ARIANNA BROWN; BRITTNEY BECK; MITCH FINICUM; THOMAS KINNE; CHALLICE FINCH; JAMES FINICUM; DANIELLE FINICUM; TEAN FINICUM; and the ESTATE OF ROBERT LAVOY FINICUM.<br><br>    *Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA; FBI, BLM; DANIEL P. LOVE; SALVATORE LAURO; HARRY MASON REID; GREG T. BRETZING; W. JOSEPH ASTARITA; STATE OF OREGON; OREGON STATE POLICE; KATHERINE BROWN; RONALD LEE WYDEN; HARNEY COUNTY; DAVID M. WARD; STEVEN E. GRASTY; THE CENTER FOR BIOLOGICAL DIVERSITY; and JOHN DOES 1-100.<br><br>    *Defendants*. | Case No. _____<br><br>CIVIL COMPLAINT<br>DEMAND FOR JURY TRIAL |

Plaintiffs, D. Jeanette Finicum, Thara Tenney, Tierra Collier, Robert Finicum, Tawny Crane, Arianna Brown, Brittney Beck, Mitch Finicum, Thomas Kinne, Challice Finch, James Finicum, Danielle Finicum, Tean Finicum and the Estate of Robert LaVoy Finicum, by and through undersigned counsel, individually and together allege in totality and in the alternative:

## STATEMENT OF THE CASE

1.   In November 2017, a widely published national news story caught the attention of the American public, when video surfaced of a North Korean citizen attempting a desperate border run for safety. The video showed that when the truck he was driving crashed on the side of the road, the North Korean citizen was aggressively pursued by an armed North Korean government force. He was shot five times, and collapsed.  News reports showed that the man survived and made it across the border, to a friendly government on the other side of the line.  The story was captivating, because in the American psyche, the idea of being shot in the back by your own government for trying to cross a border – is unthinkable.

2.   Except, this action brings to the Court a poignant circumstance where this very scenario played out inside the United States, a year and half before the North Korean defector made national news, and it took place on a remote section of road in Harney County, Oregon.

3.   On January 26, 2016, at approximately 4:40 p.m., decedent Robert LaVoy Finicum was fatally shot three times *in the back*, assassination style, by one or more militarized officers of the Oregon State Police and/or FBI.

4.   LaVoy had plainly and repeatedly explained he was going to go across the county border, to meet with Grant County Oregon Sherriff Glen Palmer, and invited several of the above-named defendants to come with him. The problem was, Sherriff Palmer had already been identified by several of the above-named defendants as an unfriendly political personality, and as being

potentially uncooperative with what has now been discovered to be the illegal, diabolical and shocking internal government scheme and conspiracy to do intentional violence to LaVoy Finicum and other political supporters of Cliven Bundy and those who were visible public critics of the BLM and federal government overreach.

5.    Unlike the North Korean who fled for the border to safety in 2017, after LaVoy Finicum was shot in the back– *he died*. As it turns out, he was deliberately executed by a pre-planned government ambush, after he had exited his vehicle with his hands up. Along an isolated section of U.S. Route 395 in Harney County, Oregon, where the only other people within miles, were those who had set-up the ambush, LaVoy Finicum was executed as he walked away from his truck in the deep snow.

6.    The murder of LaVoy was plainly unlawful under rights guaranteed by the United States Constitution and as also specified below, unlawful under other laws of the United States and the laws of the State of Oregon. It was the result of a brutally deliberate course of action willfully set in place and caused by a small selection of county, state and federal officials who are named as defendants in this lawsuit. These defendants were mentally predisposed and committed to using excessive lethal force, to solve a political dispute. The result has been both haunting and tragic.

7.    From the time LaVoy Finicum first became a government target in 2014 for his political actions, through the incident on January 26, 2016, LaVoy had not engaged in a single act of violence. The only violence that took place during that entire span of time, as it relates to anything associated with LaVoy, was on January 26, 2016, and the violence was instigated, aided, provoked, planned and carried out by the above-named defendants.

8.    Since the murder of LaVoy Finicum, it has been uncovered that the above-captioned Defendants individually and together, were engaged in a pattern and practice of deliberate

conduct, including willful and illegal conduct, which conduct was the cause-in-fact, proximate

cause and/or legal cause of the illegal shooting and death of LaVoy Finicum.

9.   It has also been uncovered that the above-captioned defendants participated directly with

and/or willfully aided and abetted a pattern of widespread and systemic corruption within

portions of the Federal Bureau of Investigation ("FBI"), the Department of the Interior, Office of

Law Enforcement and Security ("OLES"); and the Department of the Interior, Bureau of Land

Management ("BLM"), where state and federal employees engaged in the intentional

premeditated targeting of LaVoy Finicum and others (as described in more detail below),

because of 1) his association with Cliven Bundy and Bundy family members; 2) his membership

in the Church of Jesus Christ of Latter-day Saints; and 3) his political views and statements

regarding land rights and federal government overreach – specifically, his consistent political

activism and statements that were critical of the BLM.

10. As an example of actions taken by the above-captioned defendants who participated

directly with and/or willfully aided and abetted the pattern of widespread and systemic

corruption within the FBI and Department of the Interior, each of the above-captioned

defendants willfully participated in the spreading of false and maliciously inaccurate

information, which information (including law enforcement threat assessments) was known to be

false and/or incomplete, and which information maliciously and falsely characterized LaVoy

Finicum and others, as a threat to law enforcement and served as an unjustified and pre-mediated

pretext that ultimately caused the tragic killing.

11. Defendants Loretta Elizabeth Lynch, James Brien Comey Jr; Greg T. Bretzing, Katherine

Brown, David M. Ward and Steven E. Grasty exercised various degrees of supervision, control

and authority over the acts and actions that ultimately caused the unlawful execution of LaVoy

Finicum, and these defendants not only tolerated known wrongdoings by government employees within their supervision, control and authority, but also actively participated in the rampant corruption which ultimately led to the untimely and unwarranted death of LaVoy Finicum.

12. The lack of oversight and supervision, and these defendants' disregard for the constitutional rights of the public, resulted in the wrongdoings alleged herein, including the unjustified shooting of LaVoy Finicum.

13. Multiple federal agents, including but not limited to Department of Interior, OLES and BLM Special Agent Larry "Clint" Wooten have recently disclosed information and documents showing that the information and run-up to the unlawful shooting death of LaVoy Finicum on January 26, 2016 was, in significant part, the result of a known internal conspiracy within the Department of the Interior that targeted several men associated with Cliven Bundy and events that had previously taken place in Bunkerville, Nevada in April 2014, and one of these targeted individuals was LaVoy Finicum.

14. Defendants Loretta Elizabeth Lynch, James Brien Comey Jr; Greg T. Bretzing, and Harry Mason Reid and other John Doe defendants knew about the governmental misconduct referenced above, including that Department of Interior agents were engaged in deliberate discrimination and harassment targeting "supporters [of Cliven Bundy and other] Mormons (which targeting included LaVoy Finicum)."

15. At various times from April 2014 through the shooting death of LaVoy on January 2016, defendants who were employees of the FBI, the BLM and OLES conspired with each other and also acted individually in numerous acts to keep secret and cover up information and evidence probative of the cause and evidence related to the unjustified killing of LaVoy Finicum.

16. In addition to the above described conduct by the Defendants in this case, the Oregon

State Police, Harney County, Harney County Sherriff David Ward and the FBI used and employed improper police procedures and deliberately employed and carried out a plan without adequate safeguards and communication that ultimately caused the shooting death of LaVoy.

17. In the end, LaVoy Finicum suffered the unprovoked imposition of excessive and illegal police force when 1) he and his truck were fired upon without provocation by the Oregon State Police and/or the FBI at an initial traffic stop on January 26, 2016; 2) when an illegal and unconstitutional "Deadman's roadblock" was set-up prior to that traffic stop and subsequently used against him after he demanded to see the Grant County, Oregon Sheriff; 3) when he approached the roadblock and without provocation he and his vehicle were fired upon multiple times with lethal force – by the Oregon State Police, the FBI and specifically by W. Joseph Astarita; and 4) when he excited his vehicle after successfully swerving to miss a nearby officer and the roadblock, ***with his hands in the air in a surrender position*** – and multiple, lethal shots were fired at him by the Oregon State Police, the FBI and specifically by W. Joseph Astarita. Finally, the Oregon State Police and the FBI illegally and unconstitutionally used deadly force and caused the wrongful death of LaVoy Finicum by planning, conducting and carrying out the January 26, 2016 events, and ultimately by firing upon and unlawfully executing an American citizen who was seeking the protection of a county sheriff, from what we now know was an internal, corrupt, and politically motivated governmental conspiracy.

18. Since LaVoy's tragic death, facts establishing the shocking internal government misconduct and the detailed internal conspiracy among BLM, FBI and other government officials has increasingly come to light. For example, the December 2016, Larry "Clint" Wooten whistle blower report documents an internal government investigation that uncovered "a widespread pattern of bad judgment, lack of discipline, incredible bias, unprofessionalism and

misconduct, as well as likely policy, ethical and legal violations among senior and supervisory staff" involved in the official investigation and anticipated prosecution of LaVoy and others associated with events that took place in Bunkerville, NV in April 2014. That investigation concluded that law enforcement supervisors, including the John Doe defendants named in this matter, "made a mockery of our position of special trust and confidence, portrayed extreme unprofessional bias…[and] ignored the letter and intent of the law." The internal investigation also revealed that prominent Department of Justice employees (identified in this complaint currently as John Does), maliciously influenced events both proceeding and following the death of LaVoy Finicum, through "extreme personal and religious bias" and that when law enforcement agents had been observed to have engaged in "unethical/unprofessional actions, misconduct, and potential crimes" were deliberately not reported up the chain of command.

19. Finally, Defendant W. Joseph Astarita, who was a Special Agent of the FBI and member of the FBI's Hostage Rescue Team has been federally indicted for his role in covering up activities and events that took place at the side of U.S. Route 395 in Harney County, Oregon on January 26, 2016.

20. Specifically, a federal grand jury has charged Defendant Astarita with lying to investigators, making knowingly and willfully false statements, knowing that the false statements were material to the FBI's decision not to call the Shooting Incident Response team to investigate the propriety of an agent-involved shooting.  Defendant Astarita falsely stated that he had not fired his weapon at LaVoy Finicum, when he knew then and there that he had fired his weapon. He has also been charged with obstruction of justice, for engaging in misleading conduct towards another person, that is, the officers of the Oregon State Police, by failing to disclose that he had fired two rounds during the January 26, 2017, roadblock incident with

LaVoy Finicum. The grand jury has further charged Defendant Astarita with intent to hinder, delay and prevent the communication of information from the Oregon State Police to the Federal Bureau of Investigation related to the possible commission of a federal offense.

21. This lawsuit is brought to obtain relief for LaVoy's surviving heirs, and to ensure that the idea of being shot in the back, by your own government, while trying to cross a county border for protection by bona-fide law enforcement, can return to being what it once was - unthinkable.

## PARTIES

22. Robert LaVoy Finicum's legal heirs are his wife and children who survived him after his brutal killing.

23. At all times herein mentioned, **Plaintiff D. Jeanette Finicum** ("Jeanette Finicum") was the wife of LaVoy Finicum and direct heir to her husband.

24. At all times herein mentioned, **Plaintiffs Thara Tenney, Tierra Collier, Robert Finicum, Tawny Crane; Arianna Brown, Brittney Beck, Mitch Finicum, Thomas Kinne, Challice Finch, James Finicum, Danielle Finicum** and **Tean Finicum** were the children of LaVoy Finicum and direct heirs to their father.

25. Plaintiffs are the heirs, and D. Jeanette Finicum is also the personal representative of the estate of Robert LaVoy Finicum pursuant to relevant state and federal law.

26. At all times herein mentioned, **Defendant UNITED STATES OF AMERICA** ("United States") is a proper defendant pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. and pursuant to the other basis for the causes of action listed below, and was at all times material hereto, the employer of Defendants Loretta Elizabeth Lynch, James Brien Comey Jr., Greg T. Bretzing, W. Joseph Astarita and other John Doe defendants to be identified. Timely notice was given of the claims pursued herein, to the United States, pursuant to relevant United States law

and relevant administrative rules.

27. At all times herein mentioned, **Defendant FEDERAL BUREAU OF INVESTIGATION** was a public body and acting arm of the United States through the United States Department of Justice, whose highest federal officials included Loretta Elizabeth Lynch (United States Attorney General) and James Brien Comey (Director of the FBI).

28. At all times herein mentioned, **Defendant BUREAU OF LAND MANAGEMENT** was a public body and acting arm of the United States Department of the Interior.

29. At all times material hereto, **Defendant Daniel P. Love** was an agent of the United States Department of Interior, specifically the Bureau of Land Management, and was acting under the color of law and within the scope of his employment.

30. At all times material hereto, **Defendant Salvatore Lauro** was an agent of the United States Department of Interior, specifically the Bureau of Land Management Office of Law Enforcement Services ("OLES") Director, and was acting under the color of law and within the scope of his employement.

31. At all times material hereto, **Defendant Harry Mason Reid** was a United States Senator from Nevada. For purposes of the Westfall Act, Mr. Reid is sued here for actions committed within the scope of his office or employment as a U.S. Senator.

32. At all times material hereto, **Defendant Greg T. Bretzing** was an agent of the United States Federal Bureau of Investigation acting under the color of law, and within the scope of his employment.

33. At all times material hereto, **Defendant W. Joseph Astarita** was an agent of the United States Federal Bureau of Investigation acting under color of law and within the scope of his employment.

34. At all times herein mentioned, **Defendant STATE OF OREGON** ("State of Oregon" or "Oregon") is a proper defendant pursuant to Oregon Revised Statute 2015 ORS 30.265 and other relevant Oregon laws as a "public body" subject to "civil action" and was at all times material hereto the supervisor, employer or controlling entity of the Oregon State Police, Katherine Brown, and other Oregon State Police officers included as John Doe defendants to be identified. Notice of the relevant claims contained herein was timely and properly given to the State of Oregon.

35. At all times herein mentioned, **Defendant OREGON STATE POLICE** ("OSP") is the time and title used to refer collectively to the individual Oregon State Police officers involved and described herein, and each OSP officer was at all relevant times herein an agent of the State of Oregon acting within the scope of his employment.

36. At all times material hereto, **Defendant Katherine Brown** was the Governor of Oregon, and an officer or agent of the State of Oregon, acting within the scope of her office or employment.

37. At all times material hereto, **Defendant Ronald Lee Wyden** was a United States Senator from Oregon. For purposes of the Westfall Act, Mr. Wyden is sued here for actions committed within the scope of his office or employment as a U.S. Senator.

38. At all times material hereto, **Defendant Harney County** is the public body organized and existing under the laws of the State of Oregon. Notice of this claim was timely and properly given to Harney County.

39. At all times material hereto, **Defendant David M. Ward** was a resident of the State of Oregon, and the Sherriff of Harney County, acting under color of state law and within the scope of his office or employment.

40. At all times material hereto, **Defendant Steven E. Grasty** was a resident of the State of Oregon, and Harney County Judge, acting under color of state law and within the scope of his office or employment.

41. At all times material hereto, **Defendant The Center for Biological Diversity** was a national non-profit conservation organization headquartered in Tucson, Arizona and acting through directors and executive officers.

42. At all times material hereto, Defendants John Does 1-100, were agents of the United States or the State of Oregon and acting under color of law and within the scope of his or her employment.  These defendants are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiffs at this time. When their true names and capacities are ascertained, Plaintiffs will amend this complaint by inserting their true names and capacities herein. Plaintiffs are informed and believe and thereupon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff' damages as herein alleged were proximately caused by those Defendants. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to all Defendants sued under fictitious names.

43. Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned, each of the Defendants, including all Defendants sued under fictitious names, was/were the agent and employee of either the United States, the State of Oregon, or Harney County and in doing the things hereinafter alleged, was/were acting within the scope of the relevant entity and/or his or her employment.

**JURISDICTION**

44. Claims in this action arise under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Further, this Complaint raises civil rights

claims against individual federal employees and officers pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). The Court therefore has jurisdiction over this action pursuant to 28 U.S.C. § 1331 [federal question] and 28 U.S.C. § 1343(3) [civil rights] and 28 U.S.C. § 2671 [federal tort claims]. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because the 42 U.S.C. § 1983 violations, the *Bivens* tort claims, and tort liability for the state law claims arise from a common nucleus of operative facts.

45. Venue lies in the District of Oregon, the judicial district in which the claim arose, pursuant to 28 U.S.C. Section 1391(b)(2) and 1391(e)(1).

46. Plaintiffs do not agree to the applicability or constitutionality of limits on liability or other provisions of the Oregon Tort Claims Act and reserves the right to name additional individual defendants as warranted by law or fact and to challenge any limits on liability set on any of the causes of action listed below.

47. Plaintiffs have complied with all applicable notice and statutory requirements of both the Oregon and federal Tort Claims Acts.

**STATEMENT OF COMMON FACTS - BUNKERVILLE**

48. On the morning of April 12, 2014, LaVoy Finicum was present in Bunkerville, Nevada as part of a political protest against a purported BLM cattle impound operation and other government overreach, in support of Nevada Rancher Cliven Bundy and his family, who had been targeted for violence by the BLM and the FBI.

49. In fact, LaVoy had learned that in the two-weeks leading up to April 12, 2014, special agents with the BLM and FBI had targeted Bundy, had surrounded Bundy's house with militarized and armed government snipers and surveillance and had violently engaged two of Cliven Bundy's sons and had threatened violence against other members of his family.

50.  LaVoy had learned either the night before or early in the morning on April 12, that the leadership of the BLM and Department of Interior in Washington D.C., had agreed to suspend the operation in Bunkerville, and had announced that it was going to be leaving the area and surrendering the Bundy cattle that had already been gathered.

51. When LaVoy and other volunteers peacefully gathered near the cattle impound area, they and the public discovered that a faction of the BLM and other government employees engaged in the Bunkerville operation had taken up an aggressive, military style posture and were refusing to leave or surrender the cattle.

52. As it turns out, this same faction of government agents, operating under the direction and authority of Defendant Dan Love, were involved in fabricating misleading evidence against Cliven Bundy, had been involved in intentionally seeking to provoke a violent confrontation with Bundy and his supports, and had intentionally created misleading threat assessment documents, and knowingly disseminated false and misleading information to other federal agents and local law enforcement officers about Bundy and his supporters, including LaVoy Finicum.

53. It is now known that the government's own internal investigation discovered that Defendant Love acted "recklessly" but with the specific direction of a John Doe defendant named above, upon information and belief the BLM Deputy Director" to "set in motion a chain of events that nearly resulted in an American tragedy with mass loss of life." Further, the government's lead internal investigator concluded "reckless and unprofessional conduct with BLM Law Enforcement supervisory staff was apparently widespread, widely known" and covered- up, and that other government employees were "either too afraid of retaliation, or lacked the character to report and/or correct" the misconduct.

54. Mr. Finicum saw first-hand, while he was at Bunkerville, that the conflict between

peaceful political protestors and rogue overreaching federal agents, was resolved when the local Sherriff's department intervened, and when the local Sherriff's actions caused the rogue government agents to back down and to disband.

55. In fact, when the local Clark County Sherriff's office arrived on sight in Bunkerville, on April 14, 2014, several BLM and other federal agents saw the Sherriff department as hostile and aligned with the protesters.

56. Law enforcement records show that the Sheriffs' office also brought in its own SWAT Team, with its own snipers and other strategically placed personnel who set up counter positions - with the protesters, taking up strategic positions against the federal agents, pointing their guns (that is the Sherriff's SWAT snipers were pointing their guns) at the rogue federal agents – and not at the protestors.  This sent a clear message regarding the untenable position and conduct of the federal agents – who had previously been threatening over a loud speaker to shoot protesters.

57. Mr. Finicum further saw that with the intervention of several Clark County Nevada Sherriff deputies, the threat to protestors, bystanders and the observing public was dissipated, and resolved. He also saw that Defendant Love retreated and released the Bundy cattle and removed all of the federal officers and staff from the Bunkerville operation.  Mr. Finicum also witnessed that all harm and potential violence had been avoided.

58. It is now known, that from the evening of April 13, 2014, through at least mid-day on April 14, 2014, Defendant Love had instructed officers under his command – including several John Doe defendants, to systematically destroy documents and information, including a massive shredding operation to hide or conceal information prior to abandoning the operation. It is also known that Defendant Love had been on multiple phone conversations with DOJ, DOI and BLM leaders in Washington D.C., with Defendant Harry Reid, and with local DOJ officials –

expressing his vehement disagreement with their decisions, and that the operational notebook where he claimed to keep records of these conversations and several laptop computers that he used in the course of his duties, have allegedly disappeared form the government's custody and control.

59. Based upon the government's subsequent investigation, it is now known that "there was an improper cover-up in virtually every matter" that Defendant Love participated in, including Bunkerville and the post-Bunkerville targeting of individuals including LaVoy Finicum.

60. It is also known that the government's internal investigation of Defendant Love and other John Doe defendants after April 2014 revealed that they had intentionally planned and carried out the "most intrusive, oppressive, large scale and militaristic" operation as possible, and that it was Defendant Love and John Doe defendants purpose and intention to engage Cliven Bundy and his supporters (including LaVoy Finicum) in a manner that constituted "excessive use of force, civil rights and policy violations."

61. During the Bunkerville events of 2014, Mr. Finicum was identified (among many others) by Defendant Love and other John Doe defendants, as a target of their activities, and specifically as a target for using violence, meaning Defendant Love and other John Doe defendants intentionally planned to use violence against LaVoy Finicum and others.

62. This illicit targeting of LaVoy Fincium and others who Defendant Love and John Doe defendants viewed as hostile to the BLM and critical of the BLM and DOI, began on April 14, 2014 and continued through January 2016. In furtherance of this targeting, both the BLM and the FBI kept an active file on Mr. Finicum.

63. Defendant Love and other John Doe defendants fabricated information, edited, omitted or reported misleading information from this file, and added misleading information to this file, for

the purpose of intentionally creating the false impression that LaVoy Finicum was associated with militia and presented a risk of violence to law enforcement, when no threat assessment or legitimate intelligence information supported any such finding or conclusion.

64. In fact, except for the information tainted by the misconduct of Defendant Love and other John Doe defendants, there was no information prior to January 2016 to indicate that LaVoy Fincium constituted a threat or posed the possibility of violent confrontation with anyone – let alone federal agents or officers.

65. Further, Defendant Love and several John Doe defendants (including agents within the BLM and the FBI) knowingly concocted a deceptive narrative through the use of false, fabricated and falsely reported information, that LaVoy Finicum and others who were present in Bunkerville and critical of the BLM and DOI (such as Ammon Bundy, Ryan Bundy) were anti-government domestic terrorists. These agents knew this information and narrative was false and knew that by labeling Mr. Finicum as this kind of threat, that they had violated government policy, governmental guidelines, and that they were violating the constitutional protected due process and Fourth Amendment related rights of Mr. Finicum.

66. Following the Bunkerville events in 2014 and continuing through January 2016, Mr. Finicum began a YouTube channel where he periodically published educational videos explaining his political views, his views on the US Constitution, and where he described how he viewed the federal government as acting beyond its lawful limits imposed by the Constitution and by federal law.

67. In Mr. Finicum's YouTube videos he was also particularly critical of the Department of the Interior and the BLM.

68. From April 2014 through January 2016, Mr. Finicum also continued operating his own

cattle ranch and cattle operation which he purchased in 2008, and which included the grazing of cattle in Mohave County, Arizona and in Kane County, Utah.

69. From April 2014 through February 2017, the BLM and the FBI conducted an extensive investigation of what had transpired in Bunkerville, NV, regarding both the lead up to and the events that took place on April 2014. This investigation generated a substantial amount of law enforcement data, information and intelligence within the FBI and BLM, including information on and about LaVoy Finicum.

70. The data, information and intelligence generated by the investigation, included significant and substantial material generated by, edited, amended and/or derived from deliberate acts of Defendant Dan Love and other John Doe defendants.

71. Defendant Love and John Doe defendants deliberately engaged in this conduct, in part, to concoct a deceptive narrative of what happened at Bunkerville, and to paint Cliven Bundy, LaVoy Finicum, Ammon Bundy, Ryan Bundy and others, in a false light with the media, the public, and in any future court actions. The intended false light was that these men, including specifically LaVoy Finicum, presented a threat to federal agents and to the public.

72. Defendant Love and these John Doe defendants knew this information and the narrative they had created about Bunkerville was false and knew that in labeling Mr. Finicum and others in this way, violated government policy, governmental guidelines, and that it violated the Constitutional due process rights of Mr. Finicum and the other citizens involved.

73. Without any warrant, and without any probable cause to believe he had committed any crime, after April 2014 and through January 2016, at various times, Defendant Love and other John Doe defendants monitored and tracked LaVoy Finicum's YouTube videos and related activities online. Additionally, other John Doe defendants, including FBI agents and informants

acting under the direction of John Doe defendants; monitored, surveilled and surreptitiously entered into Mr. Finicum's home – without his knowledge or consent.

74. DOI BLM Special Agent Larry C. "Chuck" Wooten, who lead the post-Bunkerville investigation for the Department of the Interior and the BLM (including OLES), recently revealed that Defendant Love and John Doe defendants intentionally covered up or otherwise intentionally failed to disclose "substantive and exculpatory" information that contradicted the narrative created about Bunkerville, Cliven Bundy, and other critics of the federal government such as LaVoy Finicum. Mr. Wooten's investigation also concluded that other DOJ personnel (including John Doe defendants) became aware of the rogue faction of government agents operating under and/or in concert with Defendant Love and also became "generally aware" of the misconduct described herein, including "likely civil rights and excessive force issues" and in response the DOJ adopted a "don't ask, don't tell" mentality and approach – and these same federal employees who held high level and supervisor positions over this subject matter intentionally "discouraged the reporting" of misconduct and further discouraged the reporting of "evidence favorable to" Cliven Bundy and his supporters.

75. The government's internal investigation has also now revealed that the "talking points" used by the DOJ to describe what happened in Bunkerville in 2014 were "factually incorrect" and that John Doe defendants knew of the incorrect information and intentionally failed to take actions to make corrections. Further, the government's internal investigation concluded that the Bundy "impound" operation was largely a ruse, that the government's official explanation about Bunkerville, Bundy and his followers was the result of "cover-ups", "half-truths" and "skewed narrative", and that Bunkerville was in-fact a rogue operation full of widespread governmental wrongdoing from beginning to end, and characterized the whole matter as "a punitive and ego

driven expedition" – rather than a legitimate operation of the federal government.

76. The government's investigation also concluded that the truth about what had happened in the run up to the Bunkerville operation, the events of April 2014, and the post-Bunkerville investigation "would shock the conscious of the public and greatly embarrass" the federal government if disclosed.

77.  Nevertheless, this false and misleading information, this history of widespread misconduct, and the deliberate activities and actions taken by Defendant Love and the other above-named defendants, contributed directly to the subsequent shooting death of LaVoy Finicum in January 2016.

## STATEMENT OF COMMON FACTS – HARNEY COUNTY, OR

78. In November 2015, Cliven Bundy's son Ammon Bundy traveled to Harney County, Oregon to meet with Dwight and Steven Hammond and their family. A brief background is important to understand the relevance of this trip and subsequent events, which culminated in the shooting death of LaVoy Finicum.

79. The purpose of Ammon Bundy's meeting was related to the events in Bunkerville back in April 2014.  Specifically, at the protest in Bunkerville in 2014, when the protestors successfully rallied public interest, media interest, and the aid of the local Sherriff, they were able to correct the situation where a rogue band of otherwise unaccountable federal agents were engaged in dramatic and illegal overreach.  As such, individuals involved at Bunkerville, such as Ammon Bundy, who observed those events first hand, believed that they could use that knowledge and experience to help other individuals and families who were also being unlawfully and unfairly targeted and abused by the BLM and other federal agencies.

80. In November 2016, the story of Oregon ranchers Dwight and Steven Hammond had been

circulating across the national news and social media. On June 21, 2012, the Hammonds were convicted of felony charges for arson on public land after a long and public dispute with the federal government.

81. At sentencing, the Hammond's federal district court judge declined to apply the five-year mandatory minimum sentence, after finding it "grossly disproportionate to the severity of the offense" and also a "violation of the Eight Amendment." *See* 10/30/2012 Sentencing Hrg. at 26:3–6, *United States v. Hammond, et al*, Case No. 6:10–cr–60066–HO.

82. On February 7, 2014, after both Hammonds had completed their sentences from the above case, the Ninth Circuit Court of Appeals concluded that the district court erred in not applying the mandatory five year minimum sentence and in October 2015, the district court resentenced the Hammonds and they were required to go back to federal prison for the remainder of 5 year sentences, and were scheduled to self-surrender on January 4, 2016.

83. Beginning in approximately October 2015, and continuing through December 2015, local residents and others citizens began arriving in Harney County, Oregon from across the United States – to protest the treatment of the Hammonds. Protesters also spoke out against the general treatment of ranchers and the ranching community, as well as other types of misconduct and overreach by the federal government generally.

84. In November 2015, modeled after actions taken by protesters in Bunkerville in 2014, several thousand people and several concerned organizations signed a "NOTICE: Redress of Grievance," raising issues that the Hammond case brought to the surface. The notice was sent to Harney County Sheriff, Defendant David Ward. The notice was also sent to the Harney County Commissioners and Defendant Steven E. Grasty; local Justice of the Peace Donna Thomas, local District Attorney Tim Colahan, Oregon Attorney General Ellen Rosenblum, and Oregon

Governor, defendant Kate Brown.[1] Signers included the Bundy family, and eleven other entities and organizations.

85. On November 20, 2015, Defendant Ward (the Harney County Sherriff) published a letter replying to the "huge response from American citizens" that his office was receiving regarding the Hammond case.

86. By December 30, 2015, media sources were reporting how local citizens had begun forming organizations and joining the protests, and growing concerns about civil unrest in Harney County due to the lack of meaningful response from government officials.

87. In response, Acting United States Attorney Billy J. Williams published a letter "To The Citizens of Harney County, Oregon," stating his "respect" for the rights of these "outside individuals and organizations" to "peacefully disagree with the prison terms imposed" on the Hammonds, but explained that no injustice was occurring.[2]

88. LaVoy Finicum was not, and never became, a member of any of the above-referenced political organizations and was not, and never became, a member of any militia group. In fact, at this point in time LaVoy Finicum was not in Oregon and had no plans to be involved.

89. As of December 2015, both Ammon Bundy and LaVoy Finicum had used their experience at Bunkerville to educate the public, to advocate their political ideas and to spread the message of responsible citizen activism against federal government overreach. LaVoy had written and published a book on June 20, 2015, and had been conducting small group symposiums on the principles of freedom, and in particular related to western land issues.

---

[1] *See* https://www.oathkeepers.org/a-new-resolution-put-out-by-ammond-bundy-concerning-the-hammond-family/ (last visited Apr 18, 2016).
[2] *See* Billy J. Williams, "To the Citizens of Harney County, Oregon," available at https://www.documentcloud.org/documents/2660399-Statement-USattorney.html (last visited Apr 18, 2016).

Ammon Bundy had similarly increased his civic profile, volunteering his time giving seminars in different public forums – elementary schools, cottage meetings, and other public gatherings – on the importance of adhering to the structure of the Constitution to resolve political disagreements and on specific land rights issues.

90. By late December 2015, Ammon had met with several government officials in Oregon, including multiple meetings with the local sheriff, Defendant Ward, to try and find a way to protect the Hammonds from further injustice. He was also sharing his observations and judgment to local, county, state and national government leaders that they should do more to acknowledge citizen concerns and that they were not being productive or effective in how they were engaging those citizens who were expressing their disagreements with those leaders.

91. On January 1, 2016, LaVoy received a phone call from Ammon's brother Ryan explaining that large groups of protesters in Harney County, Oregon had planned a protest parade and a show of support and love for the Hammonds and their family. Later that day, LaVoy Finicum traveled with Ryan Bundy and others, more than 700 miles to Burns, OR, so that they could participate in the planned parade and show of support for the Hammonds.

92. What LaVoy, Ryan, and Ammon did not know, is that the BLM and FBI had been monitoring the social media posts of each of them, and had also been monitoring events in Harney County, Oregon. As part of this monitoring, BLM and FBI leadership in Oregon had been coordinating with John Doe defendants and had received the misleading information and individual profiles put together or modified by Defendant Love and other John Doe defendants, after Bunkerville.

93. Further, by this time, the FBI and BLM leadership had used the information and assistance of John Doe defendants, including the misleading and false information created after

Bunkerville, to enlist the support and cooperation of Defendant Greg T. Bretzing, Defendant Katherine Brown, Defendant Harney County, Defendant David M. Ward, Defendant Steven E. Grasty and other John Doe defendants.

94. Prior to January 1, 2016, John Doe defendants, with the assistance of Defendant Greg T. Bretzing, Katherine Brown, Defendant David M. Ward and Defendant Steven E. Grasty distributed the false and misleading information and profiles, including false and misleading information about LaVoy Finicum, to other influential government decision makers in and around Harney County.

95. As a result of the false and misleading information being spread by the defendants in this matter, local, state and federal law enforcement created specific plans and operational objectives – which plans and objectives were crafted in specific and particular ways to address the false conclusions and false narrative advanced by Defendant Love and now being advanced by Defendant Bretzing, Defendant Ward, Defendant Grasty, and Defendant Katherine Brown.

96. On January 2, 2016, most of the previously unorganized protesters in Harney County participated in a parade and show of support for the Hammonds.

97. In the late morning or early afternoon on January 2, 2016, Ammon Bundy organized a small group of protestors who had been participating in the parade and public protest, and proposed an idea that was designed to increase public awareness of the Hammond's plight, increase political pressure on government officials to address related injustices being perpetuated in Harney County, Oregon by the BLM and other federal agencies, and that would remove the bulk of activity from the center of Burns, Oregon so that the protest would be less disruptive to the average local citizens and businesses.  Specifically, Ammon proposed the protest be organized and removed from the town, to the more remote location of the Malheur National

Wildlife Refuge (approximately 30 miles out of town). The Refuge had played a central role in the Hammonds' controversy and it was also central to several of the other political disputes in and around Harney County, particularly related to federal government overreach and abuses by the BLM.

98. LaVoy Finicum had no advance knowledge or awareness of Ammon Bundy's plan, and had arrived in Burns, Oregon on January 2, 2016 planning only to participate in the parade and show of support for the Hammonds.

99. In sharing his idea initially, Ammon Bundy asked a small group of individuals to meet with him, and this included one of the local Harney County deputy sheriffs, who openly attended the meeting.

100.     As it turned out, approximately two dozen individuals attended, including LaVoy Finicum and Ryan Bundy.

101.     At this January 2, 2016 meeting, Ammon proposed there should be an <u>organized</u> and <u>focused</u> expansion of the protest, and that the effort should be **principled, non-violent, and lawful**.  During the course of the meeting he ultimately proposed a specific plan based upon his opinion, understanding and good faith belief in the principles of lawful adverse possession. Specifically, Ammon proposed that since the Refuge was empty for the holiday, that the protesters undertake an earnest, legitimate and lawful effort to stake and adverse possession claim to the Refuge, which effort should trigger a legal battle where the BLM and other related government agencies would have to prove the lawfulness and legal authority of their activities which had been based out at the Refuge for more than a generation.

102.     Mr. Bundy and several others present at the meeting had learned that the Refuge was currently unoccupied and that no government employees or officers were present.

Accordingly, he encouraged the organization of a responsible group of individuals who would travel in advance to the Refuge, verify that it was unoccupied and commence setting up the necessary requirements for a lawful attempt to establish a lawful claim for adverse possession.

103.    The idea expressed by Ammon Bundy, and agreed to by participating protestors like LaVoy Finicum, was that among other grounds in support of their protest action, there was a legitimate property law basis for attempting an adverse possession, and that because this was permitted by both state and federal law, it could also be used as a viable method of political protest, and if successful, the occupiers of the Refuge would assist Harney County and its residents in furthering legitimate and lawful aims related to the land they would occupy, and, if unsuccessful, the *attempt* to establish a lawful adverse possession claim would still focus the protest message, generate necessary media attention, and stimulate a broader national discussion of land use issues and the problem of federal overreach, including questions raised regarding Article I, Section 8, Clause 17 of the U.S. Constitution.

104.    One of the goals of the protest and adverse possession occupation was to acquire legal standing – to bring the question of federal land overreach to the federal courts' attention or to require the federal government to make solid and legitimate argument in support of its claim of ownership of the Refuge land – and with that newly acquired standing, open up a legal forum to raise the growing demands for redress on important land and property rights issues.

105.    As part of the execution of his idea, Ammon Bundy tried to ensure that the effort to establish a lawful adverse possession claim was legitimate, taking reasonable precautions to ensure that the disseizors (the occupiers) could protect themselves and the property against any unlawful force (which is required by adverse possession law) and that any activities related to that protection if their occupation were orderly and supervised by responsible people who

possessed the necessary real life experience to responsibly initiate the adverse possession claim. All this was planned in general accord with what the occupiers believed and understood as long established principles of adverse possession law.

106.    LaVoy Finicum was one of those who agreed to head out to the Refuge and see if it was going to be possible to set-up a lawful adverse possession claim and related occupation of the Refuge grounds.  Upon arriving at the Refuge, LaVoy and others began the process of formally staking a claim, under the principles of law applicable to state and federal adverse possession.

107.    As part of this adverse possession, the protestors changed the name of the Refuge to the Harney County Resource Center (the adverse possession was being undertaking in the interests of the residents of Harney County, Oregon), they published new signs, changed responsibility for the payment of utilities and services, and took other specific steps the they understood were required by law to establish the legitimate control and use of the Refuge property, as outlined in standard adverse possession law treatises.

108.    As part of the organized protest, Ammon and LaVoy become the most visible spokesmen for the adverse possession occupation and related protest. They continued to organize, spread their message, invite people to the new Harney County Resource Center, and otherwise work to expand the legitimate use of adverse possession and other lawful methods to investigate and establish other claims throughout the area.

109.    As they understood the relevant law, the occupation of the Refuge was open, hostile and notorious (these are all specific requirements the protesters understood were the legal

requirements for a legitimate adverse possession claim.)[3]  At the outset of the occupation, the occupiers also established appropriate caretaker responsibilities including securing the previously vacated property, setting up a perimeter watch, and controlling ingress and egress. They named themselves **Citizens for Constitutional Freedom**, publicly announced the formation of their association and began publishing material and press statements online in that name from January 2, 2016, through January 26, 2016, under that name.

110.      From January 2 to January 26, 2016, it is estimated that more than 1,000 individuals, including businessmen, ranchers, political protestors, elected officials from different branches of state executives and legislatures, attorneys, and federal government employees – all

---

[3] *See e.g. Robin v. Brown*, 162 A. 161, 161 (1932). In order to exercise a legitimate adverse possession claim, "[t]he disseisor must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest. He must intend to hold the land for himself, and that intention must be made manifest by his acts. It is the intention that guides the entry and fixes its character. No particular act, or series of acts, is necessary to demonstrate an intention to claim ownership. Such a purpose is sufficiently shown where one goes upon the land and uses it openly and notoriously, as owners of similar lands use their property, to the exclusion of the true owner." Further, in *Springer v. Young*, Justice Strahan explains: "An adverse possession cannot begin until there has been a disseizin; and, to constitute a disseizin, there must be an actual expulsion of the true owner for the full period prescribed by the statute. An adverse possession is aptly defined by INGERSOLL, J., in *Bryan v. Atwater*, 5 Day, 181, to be "a possession, not under the legal proprietor, but entered into without his consent either directly or indirectly given. It is a possession by which he is disseized and ousted of the lands so possessed." It should, therefore, come as no surprise to anyone, let alone the government or this court that the Refuge occupation involved "an ouster" and "a disseisin" and such actions are hardly new or un-established legal theories, and do not suggest that the character or trustworthiness of those who seek to setup a lawful adverse possession claim, is lacking. To the contrary, the specific steps and lengths to which these occupiers endeavored, including the establishment of a perimeter, the changing of the sign and renaming of the facility, the taking over of routine maintenance and cleaning, and the managing and control of the of the property, all show that this was no random or spontaneous act of dangerousness or recklessness, but a careful attempt at exercising a lawful right – including under federal statute. As the Texas Court of Appeals recently instructed, "No matter how exclusive and hostile to the true owner the possession may be in appearance, it cannot be adverse unless accompanied by intent on the part of the occupant to make it so. There must be an intention to claim the property as one's own to the exclusion of all others." *NAC Tex Hotel Co. v. Greak*, No. 12-14-00260-CV, 2015 WL 7019738, at *3 (Tex. App. Nov. 12, 2015).

came and went from the Refuge, without interference from the local, state or federal government, and there was no legal notice or arrest.

111.     As part of their role in controlling ingress and egress to establish the attempted claim of adverse possession, the Refuge occupiers (including Mr. Finicum) happily welcomed visitors – of all kinds. The leaders of the occupation regularly attended meetings in and around Burns, Oregon – making no secret of their travels, and on multiple occasions seeking meetings with local, state and federal law enforcement officials. There was nothing surreptitious or stealthy about the adverse possession of the Refuge.

112.     However, Defendants Greg T. Bretzing, Katherine Brown, Ronald Lee Wyden, David M. Ward, Steven E. Grasty and other John Doe defendants worked intentionally and deliberately to control the official narrative, and never once publically admitted the true nature of the occupation as an attempted lawful adverse possession, and never once candidly explained to the public that the normal legal remedy against an adverse possession claimant was formal notice and possible trespass charges. Further, these defendants ignored legal advice and counsel that suggested that the appropriate course of action would be legal notice and possible trespass charge – by local law enforcement and local civil court actions.  These same defendants also ignored advice from local legal authorities, that no law had been broken by the attempted adverse possession.[4]

113.     Instead, Defendants Katherine Brown, Greg T. Bretzing, Ronald Lee Wyden,

---

[4] *See, for example, In re Timmons*, 607 F.2d 120, 122 (5th Cir. 1979). This case is the only other identifiable situation where a group of political protesters took over a federal wildlife refuge, claiming to exercise adverse possession. Significantly, the government in that case did not call for militarizing the surrounding community, calling in federal law enforcement or solving the situation through force, but instead local prosecutors and local law enforcement went out and met with the occupiers and gave them a simple trespass notice. This ultimately resolved the protest and adverse possession claim without violence.

David M. Ward, Steven E. Grasty and other John Doe defendants willfully decided to fight a public political battle, and demanded that the FBI, BLM, and DOJ take the lead and bring the occupation to a close by force.

114.    As part of their agenda, Defendants Katherine Brown, Ronald Lee Wyden, David M. Ward, Steven E. Grasty and other John Doe defendants deliberately targeted LaVoy Finicum and a few others, as supposed domestic terrorists – and used this false allegation as a pretext for an enormous federal government intervention in Burns, Oregon – dramatically escalating the tensions in the community and the risk to all involved, including to LaVoy Fincium.

115.    Worse, prior to January 26, 2016, Defendants Bretzing, Brown, Wyden, Ward, Grasty and other John Doe defendants knew that the threat assessments and threat related information about LaVoy Finicum and others – was false and misleading, but encouraged other law enforcement agents and officers, and other elected officials to believe it, and act upon it anyway.

116.    Additionally, Defendant Bretzing and other John Doe defendants directly encouraged the adoption of the use of force, rather than the appropriate and civil legal remedies for resisting and removing adverse possession claimants, as a deliberate effort to continue the conspiracy, misconduct, aims and objectives of Defendant Love and other John Doe defendants in the BLM and FBI, as identified above.

117.    Defendant Bretzing and other DOJ personnel (including John Doe defendants) also knew that they were furthering the agenda of the rogue faction of government agents that had been operating under and/or in concert with Defendant Love – and were specifically targeting Bundy Family members, LaVoy Finicum, and others in Oregon who had also been participants in Bunkerville back in 2014.

118.     Defendant Bretzing also used his position and authority to continue what Agent Wooten uncovered as a "don't ask, don't tell" mentality and approach – that sought to continue disseminating the false media and PR narrative about Cliven Bundy and his supporters, and this continued as the United States and the State of Oregon deliberately and knowingly mischaracterized the nature of the Refuge occupation and the aims and objectives of LaVoy Finicum, Ammon Bundy, and other protesters associated with them.

119.     Specifically, Defendant Katherine Brown (Governor of Oregon) directly communicated with staff members that they were to work with other John Doe defendants to control the public narrative, and she further prioritized the use of force, and she did this by ignoring readily available legal advice that the Refuge occupation by itself was not an illegal activity.

120.     Defendant Bretzing, who was also closely associated with Defendant Love, continued to use and advance the false "talking points" used by the DOJ in Bunkerville, to describe what was happening in Oregon, especially as he and other agents under his command (including John Doe defendants) briefed individuals like Chad Karges, the Refuge manager – to advance the false and extremely misleading narrative that LaVoy Finicum, the Bundy's and other protestors presented a severe threat to all federal government employees.

121.      As such, Defendant Bretzing, deliberately continued the politically biased, anti-Mormon, anti-Bundy, "punitive and ego driven" agenda of Defendant Love – who had openly admitted that it was his goal to exact violence against Cliven Bundy and his supporters. Further, defendant Bretzing directed those under his command and influence, including other John Doe defendants, to continue Defendant's Love's agenda, knowing of Defendant Love's misconduct, and knowing that Defendant Love had bragged about keeping a "Kill Book" where he claimed

responsibility for a growing number of individuals who had died as a result of his leadership in BLM activities.

122.     From January 2 through January 26, 2016, neither LaVoy Finicum nor Ammon Bundy, nor anyone else occupying the Refuge received any eviction or ejectment notice, trespass complaint or any other formal demand by any local, state or federal authority claiming ownership of the Refuge grounds being claimed by the occupiers.

123.     Further, what came to light in the 2016 federal criminal trial of Ammon Bundy is that Defendant Ward, the FBI and the BLM all now admit that there was no arrest warrant issued for LaVoy Finicum, Ammon Bundy or any other leader of the Refuge occupation, there was no notice given to them that they were breaking state or federal law, and all this took place while local, state and federal law enforcement were in regular telephone and face-to-face contact with Ammon Bundy, LaVoy Finicum, Ryan Bundy and other occupiers.

124.     Further, as of January 26, 2016 there was no criminal complaint, no probable cause affidavit, no federal indictments or any other formal proceeding to inform – let alone argue – that LaVoy Finicum or any other occupier was being accused of breaking the law. Yet, as early as the first week in January 2016, FBI agents were targeting LaVoy Finicum, showing his picture to local Burns, Oregon area residents, and identifying him as a "leader" and as a threat, to local and state law enforcement, and to residents of Burns, Oregon, with the false and misleading information described above.[5]

---

[5] Contrary to the public narrative, Defendant Ward met with Ammon Bundy and Ryan Payne on January 7, 2016, several days after the occupation. Defendant Ward acknowledged that he could see positive things developing as a result of the occupation. He also admitted that the protest had successfully gained the attention of congressmen, senators, governors and that the people of Harney County had told him they were excited to see their issues getting attention. Finally, Defendant Ward acknowledged that no law was being broken, and expressly informed the occupiers that he agreed no one had been hurt and the only thing that had happened is that "some

## STATEMENT OF COMMON FACTS - EXECUTION

125.     On January 26, 2016, Ammon Bundy, Ryan Bundy, LaVoy Finicum and a few other Refuge occupiers had been invited by citizens of Grant County, Oregon (situated just north of Burns, Oregon and Harney County, OR) to give a public presentation on land rights, the Refuge occupation, etc. Grant County Sherriff Glenn E. Palmer had previously met with the occupiers and had publically called them patriots.  He had announced that he also intended to be at the public gathering that evening.

126.     Late in the afternoon, LaVoy Finicum left the Refuge driving his personal pick-up, and carrying passengers Ryan Bundy, Shawna Cox, Ryan Payne and Victoria Sharp. At the same time, a separate vehicle driven by a government informant Mark McConnell, traveled behind LaVoy, carrying passengers Ammon Bundy, Brian Cavalier on the way to the city of John Day, in Grant County, OR.

127.     Unknown to LaVoy Finicum, the FBI, Oregon State Police, and other law enforcement entities and individual personnel, had been informed in advance of the plans for the event in Grant County, and had arranged a planned ambush in the isolated mountain area between Burns, OR and John Day, OR.

128.     The United States and the State of Oregon, through its law enforcement divisions and personnel, planned and executed a two-stage operation. As the two vehicles traveled on U.S.

---

buildings have been occupied." Defendant Ward also admitted he was comfortable meeting with and talking with the occupiers, and that he had "always" felt that way since they arrived in Harney County. Finally, Defendant Ward informed the occupiers that their actions were still "on a positive note" and that he is certain that the voices of his citizens were now going to be heard. All this belies the false narrative and false talking points that Defendant Ward and the other defendants described above – purposefully advanced to accomplish the aims and objectives of Defendant Love and Defendant Bretzing and other John Doe defendants who were intentionally planning harm and violence to the Bundys, to LaVoy and to others involved with Bunkerville.

Route 395 in Harney County, in an area strategically planned by Defendants Bretzing, Brown, Ward, FBI, BLM, and the Oregon State Police, unmarked dark SUV vehicles were used by these defendants and other John Doe defendants, to stop and pull over the two vehicles in what the government has called a "high risk" felony traffic stop.

129.    However, at the time of the "traffic stop", which was accompanied by the use of federal air surveillance, among other extreme accoutrements of arrest, there was still no arrest warrant, sworn affidavit or probable cause statement, criminal complaint or indictment against LaVoy Finicum, or any of the passengers in these vehicles.

130.    In fact, FBI and OSP agents involved in the operation admitted during the criminal trial of Ammon Bundy (and others) in 2016, that they had been told conflicting reasons and legal grounds for the stop, and that at the time of the stop they could not have identified the specific legal basis for the arrest.

131.    In fact, the operation was relying upon representations and assurances from Defendants Bretzing, Brown, Wyden and other John Doe defendants – who were deliberately advancing what the government has now uncovered was the deliberate scheme of a rogue faction of government agents to inflict violence upon Cliven Bundy, his family, and his supporters – including particularly "Mormons" and those who were speaking publically against the BLM.

132.    Further, Defendants Bretzing, Brown and Ward all knew that Grant County Sheriff Glenn Palmer had refused to participate in the illegal misconduct, recklessness, constitutional violations and conspiracy. They knew this because they had originally been told by their strategic planners that a stretch of road in Grant County would have been a more suitable place for the traffic stop, but under directions and/or input from Defendants Brown and Bretzing and other John Doe defendants the location was moved into Defendant Ward's county – to avoid

Sherriff Palmer.

133.    The FBI and OSP have now admitted that the leaders of the operation intentionally moved the operation to avoid Sherriff Palmer and to rely instead on Defendant Ward's and Defendant Grasty's support.

134.    This move was strategic and significant because in Bunkerville, in 2014, this same agenda and several of these same defendants had been thwarted in their plans by the local Sherriff, as described above.  Just like LaVoy Finicum had learned, these defendants knew that bona-fide and unbiased law enforcement would de-escalate and prevent the use of force that had been pre-planned.

135.    Not only had the government (through the FBI, OSP and other defendants described above) planned the speculated "high risk" traffic stop and warrantless arrest, it had set-up a second stage of the operation with a Deadman's roadblock, were the U.S. Route 395 was completely blocked, heavily armed agents (including Defendant W. Joseph Astarita and other John Doe defendants) were strategically positioned behind the roadblock, and some were placed as surreptitious snipers hiding in the trees alongside the road.

136.    In setting up the stop and roadblock in this manner, the FBI, OSP, Defendants Brown, Bretzing and others, intentionally set-up an ambush – designed to inflict violence, through the use of lethal force, in furtherance of the corrupt aims, objectives and misconduct described above, and also in furtherance of the conspiracy described herein.

137.    The second vehicle with McConnell, Ammon Bundy and Brian Cavalier was pulled over and the occupants arrested.  The lead vehicle, LaVoy's truck, was also pulled over.

138.    Shortly after LaVoy stopped his truck, the FBI and/or OSP fired upon the truck. The firing was entirely unprovoked. After this, Ryan Payne exited the vehicle and was arrested.

139.    LaVoy and Ryan Bundy began yelling out the window, communicating with the FBI and OSP and other defendants named above, including John Doe defendants. During this communication LaVoy was never informed that there was a roadblock ahead. However, during the communication LaVoy repeatedly and clearly told the men pointing weapons at him that he was going to continue travelling until he could get to Grant County and meet Sherriff Palmer. LaVoy invited those who had stopped him to follow him to Grant County and to discuss any issues they had with Sherriff Ward.

140.    Without explanation, OSP and the FBI demanded that LaVoy and the passengers in the truck surrender. It was unclear to LaVoy, for a large portion of the time, who the officers were that had pulled him over. After the officers claimed to be from the OSP, LaVoy explained that he was not going to surrender, and that instead he was going to continue traveling to Grant County, to meet with Sherriff Ward.

141.    At this point in time, there was no credible information possessed by law enforcement that LaVoy Finicum posed a significant threat to any person or to any property.

142.    At this point in time, there was no credible information that justified the use of lethal force against LaVoy or any of the occupants of the vehicle he was driving.

143.    Nevertheless, LaVoy knew that at this point he had been pulled over by unmarked vehicles, by heavily armed men claiming to be legitimate law enforcement, but who had also fired upon him and his truck, completely unprovoked.

144.    At some point during the "traffic stop" both Shawna Cox and Ryan Bundy began using their phones to record as much of the encounter as possible.  Those recordings are in the possession of the OSP, the FBI and other government officials. They are also widely available on public social media sites like YouTube and Facebook.

145.    Approximately seven minutes into the "traffic stop" LaVoy drove away. About a mile later (while being pursued by the OSP, the FBI and other defendants and John Doe defendants), LaVoy rounded a bend in the road and encountered a roadblock.

146.    The roadblock had been strategically placed so as to prevent it from being visible until impact was a near certainty for any vehicle traveling at posted speeds.

147.    Again unprovoked, Defendant Astarita, OSP and/or FBI and other defendants and John Doe defendants fired lethal rounds at the truck.

148.    Video produced by government surveillance, and subsequently distributed to the public, shows that upon first seeing the roadblock LaVoy immediately braked, and repeatedly attempted to slow his vehicle.

149.    LaVoy was physically unable to avoid the Deadman's roadblock and ambush, but successfully and intentionally steered off the road to avoid hitting the road block, and also avoided hitting any law enforcement personnel – including the law enforcement personnel who deliberately jumped in front of his truck.

150.    The OSP, the FBI, Defendant Astarita, other defendants and certain John Doe defendants clearly had the element of surprise, and had designed the roadblock and participated therein, knowing and taking advantage of the element of surprise.

151.    Nevertheless, OSP and the FBI, as well as several John Doe defendants, fired multiple lethal rounds at and into the truck as it approached the roadblock even though it was visibly maneuvering to avoid collision.

152.    In fact, after the truck had come to a complete stop on the side of the road, in deep snow, buried deep and obviously immobile - OSP and the FBI, as well Defendant Astarita and other John Doe defendants fired additional lethal rounds at LaVoy and into the truck.

153.     Almost immediately upon impact in the snow, LaVoy intentionally exited the vehicle in an apparent attempt to draw away fire, vocally expressing that he realized he was being targeted for assassination.

154.     As LaVoy exited the driver side door, with his hands in the air, OSP and/or FBI agents (including John Doe defendants) fired at LaVoy, entirely unprovoked and without lawful justification.

155.     Again, with the element of surprise, OSP and FBI continued to fire a barrage of lethal and non-lethal rounds at LaVoy and the truck, and the surreptitiously placed and heavily armed officers in the trees began to make themselves visible.

156.     As LaVoy turned from the officers in the trees, he was shot from behind, in the back, three times with lethal rounds. These shots came from OSP and/or FBI officers (including John Doe defendants).

157.     No threats or indications of threats came from the passengers in the truck, yet FBI and BLM officers and other John Doe defendants continued to fire upon the truck for almost ten minutes.

158.     During the shooting period, passenger Ryan Bundy was also shot in the arm with a lethal round.

159.     No government agent attended to LaVoy or attempted to administer aid or relief for at least 10 minutes. LaVoy died, on the ground, in the snow. Defendants further left LaVoy dead in the snow for several hours, and upon information and belief, into the next day.

160.     Autopsy confirmed that LaVoy was murdered, the cause of death: homicide. All wounds were specified as gunshot entry from the back (posterior left shoulder, left upper back and right lower back.)

161.    Investigators with the Deschutes County Sheriff's Office, assigned to process the scene of the shooting, were accounting for the known sets of shots fired by the OSP officers during the event (the shots that apparently killed LaVoy) and other shots that struck his vehicle) when they discovered a bullet that struck the roof of the truck at a different trajectory.

162.    After ascertaining the bullet's existence with cell phone video taken by either Shawna Cox or Ryan Bundy, investigators modeled the bullet's trajectory using computers, and determined that the bullet was fired from the direction where two FBI agents had been standing.

163.    Investigators later determined that a FBI Hostage Rescue Team member fired twice at LaVoy, missing and likely the cause of the injury to Ryan Bundy. At least one agent whose identity was withheld, but who is named herein as a John Doe defendant, was under investigation, along with four other FBI agents who were suspected of attempting to conceal evidence of the gunshots.

164.    FBI Agents, including John Doe defendants named herein, all told investigators that none of them fired a shot during the incident. However, as with the post-Bunkerville investigation this turned out to be part of a scheme of lies. FBI Agents, including John Doe defendants purposefully and intentionally hid evidence and interfered with investigator's ability to find the truth.

165.    A federal grand jury has now charged, and it is here alleged independently, that Defendant  W. Joseph Astarita, who was a Special Agent of the FBI and other defendants named herein, lied and covered-up up activities and events that took place at the side of U.S. Route 395 in Harney County, Oregon on January 26, 2016.

166.    Specifically, Defendant Astarita made knowingly false statements to investigators and he did so knowing that his false statements were material to the FBI's decision not to call the

Shooting Incident Response team to investigate the propriety of the shooting of LaVoy Finicum.

167.     Defendant Astarita falsely stated that he had not fired his weapon at LaVoy Finicum, and other John Doe defendants joined, supported, aided and conspired to further the lie and misinformation. Defendant Astarita and these defendants knew then and there that Defendant Astarita had fired his weapon.

168.     Also, during initial processing of the scene, the rifle cartridge casings fired by at least one FBI agent was reported not present. However, an OSP officer later described seeing two casings at the scene near where the FBI agents were positioned. FBI aerial surveillance video shows agents searching the area, then huddling together before breaking up moments later, with one agent bending over twice to pick up an unknown object.

169.     On May 12, 2016, more than a dozen Arizona elected officials and prior elected officials wrote a letter to Defendant Brown, and asked her and the State of Oregon to conduct a more transparent and thorough investigation into the roadside execution of LaVoy Finicum on January 26, 2016. Defendant has refused.

170.     After the acquittal of Ammon Bundy, Ryan Bundy, Ryan Payne, Shawna Cox, Neil Wampler, Jeff Banta and David Fry, in October 2016 in the federal district court, District of Oregon, several similar requests were made to Defendant Brown, the FBI and the BLM, by elected officials, public organizations and private attorneys. To date, all have refused or have failed to make the date and information and conclusions from such investigations known to Plaintiffs.

## FIRST CAUSE OF ACTION
**(Wrongful Death – Federal Tort Claims Act)**
**(Against The United States of America)**

171.     Plaintiffs re-allege all preceding and subsequent paragraphs here, both as if fully

set forth here.

172.     Defendant UNITED STATES is liable to Plaintiffs because officers, agents, and employees of the FBI, employees of the BLM, and other employees, agents or officers of the United States, along with others, caused LaVoy Finicum's wrongful death by the acts and omissions described above.

173.     At all material times hereto, the agents of the United States worked within the scope of their employment.

174.     Defendants Love, Bretzing, Lauro, Reid, Astarita, Wyden and other John Doe defendants, acted jointly, violated both the Fourth and Fifth Amendment resulting in the death of LaVoy Finicum.

175.     None of these defendants intervened to prevent the wrongful acts described herein, though able. These wrongful acts, individually and combined, were sufficient legal cause of the wrongful death of LaVoy Finicum to create liability for the UNITED STATES and to justify this cause of action.

176.     The UNITED STATES, if a private person, would be liable to Plaintiffs for the acts and omissions of its employees, officers, and agents under the law of the place where said acts and omissions occurred, to wit, under common law tort claims for wrongful death, negligent hiring, supervision and retention of agents and employees.

177.     These defendants knew the Defendant Love, Defendant Bretzing and other John Doe defendants were unfit to serve as sworn law enforcement officers when hired and when assigned to the cases and matters described and relevant herein and failed to terminate him until after the tragic shooting death of LaVoy Finicum, which death Defendants caused.

178.     The wrongful acts and omission of the Defendant UNITED STATES caused

injury and death to the Decedent and harm to his estate and survivors.

179.      As a direct and foreseeable result of the respective negligent and careless acts and omissions of Defendants, Decedent LaVoy Finicum suffered injury and death.

180.      As a direct and foreseeable result of the respective intentional wrongful acts of Defendants, Decedent suffered injury and death.

181.      Decedent left Plaintiffs as lawful survivors under relevant law.

182.      Decedent's survivors, Plaintiffs herein, suffered emotional and economic damages as a result of his death, at the time, now and into the future.

183.      Decedent LaVoy Finicum suffered wrongful death by virtue of Defendant UNITED STATE's actions, practices and policies in this regard. Decedent's survivors and Plaintiffs herein, sustained and continue to sustain damages for lost companionship, support and for mental pain and suffering.

184.      Plaintiff Jeanette Finicum also seeks damages as the Personal Representative of Descendent LaVoy Finicum's estate for past and future medical and funeral expenses and lost earnings and lost value to his assets and estate.

185.      Plaintiffs timely submitted an administrative claim to the FBI and to the United States Department of Justice.

186.      The UNITED STATES failed to make a final disposition of the claims within six months and the claimants have elected to deem them denied.

WHEREFORE, Plaintiffs seek compensatory and punitive damages and costs against Defendant UNITED STATES, and such other relief as justice may require.

**SECOND CAUSE OF ACTION**
**(Bivens Action – Fourth and Fifth Amendment)**
**(Against all Federal Agents, Employees, Officers)**

187.      Plaintiffs re-allege all preceding and subsequent paragraphs here, both as if fully set forth here.

188.      Plaintiffs are entitled to relief against all defendants named herein who are federal agents, employees or officers, because they individually and together violated LaVoy Finicum's Fifth Amendment Due Process rights (e.g. false statements, conspiracy, misconduct, labeling as domestic terrorist, false attribution of threats, etc.) and Fourth Amendment rights (e.g. excessive and Unlawful and Unnecessary Force, etc.).

189.      These defendants used deadly force against LaVoy Finicum without justification and without any threat of serious harm to any person.

190.      The conduct of these defendants described herein, and their related and linked use of unjustified deadly force constituted a battery on Mr. Finicum, which conduct led to his wrongful death under Oregon law.

191.      As a result of the wrongful acts of these defendants, the estate and survivors of LaVoy Finicum have suffered harm as described above.

WHEREFORE, Plaintiffs seek damages as noted below.

## THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983 – Excessive Force)
### (Against the Individual Defendants, In Their Individual Capacity)

192.      Plaintiffs re-allege all preceding and subsequent paragraphs here, both as if fully set forth here.

193.      Plaintiff is entitled to relief against all of the individual defendants named in this suit, because they violated state and constitutional law causing LaVoy Finicum's death.

194.      All of the individual defendants (excluding The Center for Biological Diversity) acted under color of law or lawful authority and power.

195.    These defendants acted jointly and collectively with each other in the wrongful acts leading to the death of LaVoy Finicum.

196.    Each of these defendants failed to intervene to prevent abuse, though able.

197.    As a result of the wrongful acts of these defendants, the estate and survivors of LaVoy Finicum suffered harm as described above.

198.    Plaintiffs also suffered the cost of legal services.

WHEREFORE, Plaintiffs seek relief as noted below.

## FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – Deprivation)
### (Against the Individual Defendants, In Their Individual Capacity)

199.     Plaintiffs re-allege all preceding and subsequent paragraphs here, both as if fully set forth here.

200.    In doing the foregoing wrongful acts, Defendants and each of them, acted in reckless and callous disregard of the constitutional rights of LaVoy Finicum. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual defendant in an amount adequate to punish the wrongdoers and independently to deter future misconduct.

201.    Additionally, Defendants, acting under color of state and federal law (excluding The Center for Biological Diversity), deprived Plaintiffs of their right to a familial relationship without due process of law by their sue of unjustified and fatal force against LaVoy Finicum with the deliberate intent to cause LaVoy Finicum harm so that he could not and would not return to his family in his home state of Arizona, in violation of rights, privileges, and immunities secured by the First and Fourteenth amendments to the United States Constitution.

202.    As a result of the foregoing wrongful acts of Defendants, and each of them,

Plaintiffs sustained general damages, including grief, emotional distress, pain and suffering, loss of comfort and society, and special damages, including loss of support, in and amount according to proof.

203.    As further damage, Plaintiffs have incurred and will continue to incur attorney's fees, and pursuant to 42 U.S.C. ¶ 1988, are entitled to recovery of costs and fees in pursuing rights for a violation of 42 U.S.C. § 1983.

### FIFTH CAUSE OF ACTION
**(42 U.S.C. § 1983 – *Monell*)**
**(Against All Defendants)**

204.    Plaintiffs re-allege all preceding and subsequent paragraphs here, both as if fully set forth here.

205.    Plaintiffs bring this claim for relief in their capacity as the successors-in-interest and personal representative of the decedent.

206.    Defendants, and each of them, knowingly and with gross negligence, maintain permit and ratify policies and customs which allow the occurrence of the types of wrongs set forth herein above, all in deliberate indifference to the constitutional rights of citizens.

207.    The FBI, the BLM, the State of Oregon, the OSP, Harney County, Lauro and other individuals and entities continued the employment and/or association with the Defendants, and allowed little to no supervision of these officers, agents or employees, in spite of the fact that these Defendants had prior complaints for misconduct. Defendant Love and other John Doe defendants were known to be engaged in a pattern of rampant corruption and misconduct, and the government's own internal investigations reached this same conclusion.  These defendants and those aligned with and assisting them, participated in the corruption described above, which all led to the death of LaVoy Finicum.

208.    The widespread corruption and misconduct described and otherwise identified herein, included illegal targeting, religious bias and persecution, mishandling and destroying evidence, pursuing vendettas and purposefully using government resources to harm and inflict unnecessary violence, and other egregious forms of wrongdoing – which allowed and even assisted Defendants in violating state and federal law, and specifically the Fourth and Fifth Amendment, resulting in the shooting death of LaVoy Finicum.

209.    Defendants' deliberate indifference in the training of its law enforcement officers and other agents, related to the use of reasonable force and lawful seizures, as well as the deliberate indifference by the relevant government hierarchy to the safety of citizens or the adherence to the Constitution's protection of individual rights, are the moving force behind the misconduct engaged in by Defendants.  The widespread corruption and misconduct are all factors leading to the shooting death of LaVoy Finicum.

210.    Further the ratification of misconduct by Defendants, along with the failure to conduct adequate investigations of misconduct led to the violations of Plaintiffs' and Mr. Finicum's constitutional rights.

211.    Based upon the principles set forth in *Monell v. New York City Dept. of Social Services*, the FBI, the BLM, the State of Oregon, the OSP, and Harney County are liable for all the injuries sustained by Plaintiffs as set forth above.

212.    Due to the conduct of Defendants, and each of them, Plaintiffs have incurred and will continue to incur attorneys' fees, and are entitled to recovery of said fees pursuant to 42 U.S.C. § 1988.

## SIXTH CAUSE OF ACTION
### (Conspiracy)
### (Against All Defendants)

213.    Plaintiffs re-allege all preceding and subsequent paragraphs here, both as if fully set forth here.

214.    Plaintiffs are entitled to relief against all Defendants because they conspired with each other and together, to cause LaVoy Finicum's harm and ultimate death under *Bivens*, 42 U.S.C. 1983, color of state law, and relevant state common law and statutory authority.

215.    Defendants acted strategically to perpetrate and then cover up their wrong doing.

216.    Defendants knew of the wrongdoing, and each and all of them failed to intervene to prevent harm to LaVoy Finicum, though able.

217.    As a result of this conduct, Plaintiffs have suffered harm as noted above, and are entitled to damages and attorney fees as also noted above.

## Seventh CAUSE OF ACTION
### (Negligence)
### (Against All Defendants)

218.    Plaintiffs re-allege all preceding and subsequent paragraphs here, both as if fully set forth here.

219.    Defendants and each of them owed a duty to the public to properly train and supervise the officers, employees and agents under their control and influence.  They failed to do so.  This led to the untimely and unwarranted death of LaVoy Finicum.

220.    Defendants also owed a duty to LaVoy Finicum, to conduct themselves reasonably and safely so as not to harm him in the circumstances that occurred.

221.    Defendants are liable or their neglect pursuant to Oregon State law.

222.     Plaintiffs filed timely claims pursuant to Oregon State law.

223.     Plaintiffs are parties with proper standing pursuant to Oregon State law.

224.     Plaintiffs are entitled to pursue and obtain the remedies prayed for herein, including for each of them, pecuniary loss and other compensable injuries resulting from the loss of the society, comfort attention services and support of the decedent LaVoy Finicum.

225.     The loss of LaVoy Finicum will continue to cause great and severe damages to Plaintiffs, all in an amount according to proof.

226.     As a further and direct result of the acts, omissions, negligent conduct, and/or reckless disregard for the safety of LaVoy, by Defendants, and each of them, Plaintiffs have incurred funeral and burial expenses, medical expenses and other incidental costs and expenses in an amount according to proof.

### EIGHTH CAUSE OF ACTION
**(Assault and Battery – Common Law)**
**(Against State of Oregon and Harney County)**

227.     Plaintiffs re-allege all preceding and subsequent paragraphs here, both as if fully set forth.

228.     Defendants engaged in intentional attempts to do violence against LaVoy Finicum, coupled with the present ability to carry the intentions into effect.

229.      Defendants engaged in voluntary acts that caused intentional harm and contact with LaVoy Finicum, including shooting him three times in the back.

230.     As a direct, proximate and foreseeable result of these actions, LaVoy suffered deprivation of his constitutional rights, injury, harm, pain and suffering, and compensable economic loss.

JURY DEMAND

231.        Plaintiffs demand a trial by jury on all claims so triable.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.  For general damages in an amount according to proof, but no less than $5,000,000 for each plaintiff, but as permitted by law;

2.  For special damages in an amount according to proof; as permitted by law,

3.  For punitive damages against the individual officers, in an amount according to proof and as permitted by law,

4.  For injunctive relief;

5.  For reasonable attorneys' fees and costs where applicable;

6.  For costs of suit herein incurred; and

7.  For such other and further relief as the Court may deem just and proper.

DATED:  January 25, 2018

*/s/ Lisa Ludwig*
Lisa Ludwig, OSB #953387
Attorney for Plaintiffs

*/s/ J. Morgan Philpot*
J. Morgan Philpot, OSB #144811
Attorney for Plaintiffs