J. Morgan Philpot (Oregon Bar No. 144811)
morgan@jmphilpot.com
JM PHILPOT LAW, PLLC
1063 East Alpine Drive
Alpine, UT 84004
(801) 891-4499
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| D. JEANETTE FINICUM; THARA TENNEY TIER COLIER; ROBERT FINICUM; TAWNY CRANE; ARIANNA BROWN; BRITTNEY BECK; MITCH FINICUM; THOMAS KINNE; CHALLICE FINCH; JAMES FINICUM; DANIELLE FINICUM; TEAN FINICUM; and the ESTATE OF ROBERT LAVOY FINICUM. | Case No. 2:18-CV-00160-SU<br><br>SECOND AMENDED COMPLAINT<br>DEMAND FOR JURY TRIAL |
| *Plaintiffs*, | |
| v. | |
| UNITED STATES OF AMERICA; FEDERAL BUREAU OF INVESTIGATION; BUREAU OF LAND MANAGEMENT; DANIEL P. LOVE; SALVATORE LAURO; GREG T. BRETZING; W. JOSEPH ASTARITA; SPECIAL AGENT BM; MICHAEL FERRARI; STATE OF OREGON; OREGON STATE POLICE; TRAVIS HAMPTON; TROOPER 1; TROOPER 2; KATHERINE BROWN; HARNEY COUNTY; DAVID M. WARD; STEVEN E. GRASTY; THE CENTER FOR BIOLOGICAL DIVERSITY; and JOHN DOES 1-100. | |
| *Defendants*. | |

Plaintiffs, D. Jeanette Finicum, Thara Tenney, Tierra Collier, Robert Finicum, Tawny

Crane, Arianna Brown, Brittney Beck, Mitch Finicum, Thomas Kinne, Challice Finch, James

Finicum, Danielle Finicum, Tean Finicum and the Estate of Robert LaVoy Finicum, by and

through undersigned counsel, individually and together allege in totality and in the alternative:

## STATEMENT OF THE CASE

1. On January 26, 2016, at approximately 4:40 p.m., decedent Robert LaVoy Finicum ("LaVoy") was fatally shot three times *in the back*, assassination style, by one or more militarized officers of the Oregon State Police ("OSP") and/or the Federal Bureau of Investigation ("FBI").[1]

2. The brutal shooting of LaVoy Finicum ("LaVoy") was the result of an unconstitutional scheme and plan orchestrated and/or carried out by the above-captioned defendants, and also proximately caused be the negligence and wrongful conduct of officers and agents of the UNITED STATES, the STATE OF OREGON, and HARNEY COUNTY.

3. In carrying out the above-referenced plan and conduct related thereto, the defendants advocated for, caused, and used excessive lethal force and unconstitutional force to solve a political conflict; that is, to silence LaVoy Finicum, to silence LaVoy's political speech and political protests as well as the speech and protests of his like-minded associates.

4. The plan was also designed and implemented to end, with lethal force, a growing series of political protests by LaVoy Finicum and others participating with him, against federal government overreach and illegal activity by the BLM and other divisions within the United States Department of the Interior.

5. More specifically, the tragic killing of LaVoy Finicum, was the result of a brutally

---

[1] Officers included members of the FBI's Hostage Rescue Team ("HRT"), and the Oregon State Police Special Weapons and Tactics team ("OSP SWAT"). At least two units of HRT operators were deployed – HRT Blue and HRT Gold, supported by other members of the HRT Grey team. The HRT teams were organized in a military-style chain of command. Each was commanded by a Unit Chief who was supported by a Senior Team Leader. The Senior Team Leader was responsible for three or four Team Leaders. Each Team Leader oversaw six to eight operators.

deliberate course of action, unconstitutional conduct and a series of individually wrongful and negligent actions, set in place and caused by a small selection of federal, state and county officials and a small number of private entities and individuals, all of which are named herein as Defendants, with the most influential and instrumental actors being defendants DANIEL P. LOVE ("LOVE"), GREG T. BRETZING ("BRETZING"); W. JOSEPH ASTARITA ("ASTARITA") FBI Special Agent BM ("SPECIAL AGENT BM"); TRAVIS HAMPTON ("HAMPTON"), MICHAEL FERRARI ("FERRARI"); and individuals known as Trooper 1 ("TROOPER 1") and Trooper 2 ("TROOPER 2") of the Oregon State Police.

6.   Other defendants, including the STATE OF OREGON; OREGON STATE POLICE; Oregon Governor KATHERINE BROWN, HARNEY COUNTY, Harney County Sheriff DAVID M. WARD ("WARD") and Harney County Judge STEVEN E. GRASTY ("GRASTY") intentionally and knowingly cooperated with the unlawful, unconstitutional, negligent and wrongful plans and acts orchestrated by others, and purposefully joined in and united with their unlawful and wrongful aims, objectives and actions as described herein, and further aided and assisted those plans and actions instigated by and/or supervised by LOVE, BRETZING, SALVATORE LAURO ("LAURO"), ASTARITA, HAMPTON, FERRARI, SPECIAL AGENT BM, TROOPER 1, TROOPER 2).

7.   Defendants intentionally used their position and influence to further the unlawful, unconstitutional, negligent and wrongful acts described herein, and knowingly and purposefully sought to further the schemes and plans of the other defendants, and further acted to accomplish their own political aims and objectives through the aid, encouragement, and deliberate assistance of deploying excessive force, in authorizing and supporting and circumventing known government policies, law and key constitutional protections designed to protect all Americans.

8. The government officers, agents and personnel named as defendants herein were also aided, supported and helped by the deliberate and deceptive efforts of the CENTER FOR BIOLOGICAL DIVERSITY ("CBD") and other JOHN DOE defendants.

9. The specific wrongful conduct engaged in by Defendants, as described and detailed herein, was also the direct result of a deliberate and/or incompetent and/or negligent failure by Defendants UNITED STATES; FBI; BLM; LOVE; LAURO; BRETZING; ASTARITA; SPECIAL AGENT BM; HAMPTON; FERRARI; STATE OF OREGON; OREGON STATE POLICE; TROOPER 1; TROOPER 2; KATHERINE BROWN; HARNEY COUNTY; WARD; and GRASTY to properly train and supervise defendants acting under their care and control, and to properly implement and carry out known duties, policies and obligations designed to protect the constitutional rights of United States citizens.

10. Individually and together, all of the above-named Defendants were the cause or proximate cause of the January 26, 2016, government sanctioned killing of LaVoy Finicum.

11. Defendants' plans, events and actions carried out on January 26, 2016 were significantly motivated by political and personal animus of government agents and officers who intentionally sought to discredit and disempower the political speech and protests of LaVoy Finicum and his associates.

12. Further, all of the plans, events and actions carried out by defendants before and as more fully detailed below, during and after January 26, 2016 – related to the planning, executing and shooting of LaVoy Finicum - were the result or proximately the result of defendants acting with plain incompetence and/or in plain and knowing violation of known legal duties, known constitutional limits.

13. In the end, the manner and method of government action against LaVoy Finicum on

January 26, 2016, is hauntingly similar to a widely published national news story that caught the attention of the American public back in November 2017, when video surfaced of a North Korean citizen attempting a desperate border run for safety.

14. The 2017 North Korean video showed that after a truck being driven by a political dissident crashed on the side of the road, the driver was aggressively pursued by an armed North Korean government force. He was subsequently shot five times as he sought protection across the border and collapsed as a result of the brutal assault by government officers. News reports later showed that the North Korean man survived and ultimately made it across the border, to a friendly government on the other side of the line willing to protect his life and stand between him and the government force seeking to silence him. The story was captivating, because in the American psyche, the idea of being shot in the back, by your own government, for trying to cross a political border while fleeing for safety – is unthinkable.

15. This action brings to the Court a poignant and intolerable circumstance where that shocking scenario played out a year and half before the North Korean defector made national news, ***inside the United States***, on a remote Oregon highway, approximately 19 miles north of Burns, Oregon.

16. Among the many differences between the North Korean atrocity and LaVoy Finicum's circumstances is that LaVoy had already reached out to law enforcement and political leaders, and at the beginning of his encounter with federal and state authorities on January 26, LaVoy had plainly and repeatedly informed defendants, including specifically FBI and OSP officers, that he was seeking to go across the county border, that he wanted to meet with bona-fide law enforcement officer Sheriff Glenn Palmer from Grant County, Oregon, and he also expressly invited several of the above-named defendants to come with him.

17. In response, FBI, OSP and their agents, including multiple individual defendants named herein, including but not limited to ASTARITA, HAMPTON, FERRARI, SPECIAL AGENT BM, TROOPER 1 and TROOPER 2, pursued him, ensured that he would not make it across the county border to reach Sheriff Palmer, and ultimately shot LaVoy Finicum dead.

18. In furtherance of the unlawful aims, unlawful and unconstitutional conduct, and other wrongful acts described herein, TROOPER 1 and TROOPER 2 revealed that Defendants involved, including FBI, OSP, and TROOPER 1 and TROOPER 2 had planned in advance to kill LaVoy Finicum, and made statements on their two-way radio during the events of January 26 described in detail below, after LaVoy Finicum announced his plan to reach Sherriff Palmer, "we're going to have to kill this guy."

19. The use of deadly force against LaVoy and those traveling with him on January 26th, was not a matter of exigency or public safety. It was the wrongful, negligent and politically motivated response of the FBI, the OSP, Oregon Governor KATHERINE BROWN, Sheriff DAVID M. WARD, Harney County Judge STEVEN E. GRASTY, BLM agent DANIEL P. LOVE, FBI agent GREG T. BRETZING, and several other defendants including ASTARITA, HAMPTON, FERRARI, TROOPER 1, TROOPER 2, and other JOHN DOE defendants; all of whom already knew that Sheriff Palmer was sympathetic to the political and constitutional principles at the core of LaVoy's recent political messages and the related growing protests that had been going on for several weeks in Harney County, Oregon.

20. These same defendants also knew that Sheriff Palmer was willing to meet and talk with LaVoy and his fellow protestors, and that he (Sheriff Palmer) was not agreeable to FBI and OSP officers using illegal, unconstitutional and unnecessarily violent tactics to accomplish their aims.

21. More specifically, as of January 26, 2016, Sheriff Palmer had already been identified by

several of the above-named defendants as an unfriendly political personality, and as being

uncooperative with what has now been discovered to be the shocking internal government

scheme and conspiracy to do intentional violence to LaVoy Finicum, to other political supporters

of Cliven Bundy, and to several other visible public critics of the BLM.

22. Unlike the North Korean who fled for the border to safety in 2017, after LaVoy Finicum

was shot multiple times in the back– *he died*.

23. The conduct of the Defendants in this case constitute multiple violations of state and

federal policies designed to protect U.S. Citizens from overzealous, corrupt, negligent,

incompetent and/or reckless government officers and agents.

24. On top of the above-stated facts, the UNITED STATES, officers from the STATE OF

OREGON (as described in more detail below) and investigating officers and agents employed by

the UNITED STATES and the STATE OF OREGON have all recently admitted and

acknowledged, and it is in fact true, that before and after LaVoy's murder, BLM, FBI, OSP and

other state and federal officers deliberately planned and acted to hide, obfuscate, interfere with

and destroy evidence related to the activities and events described herein, including the factual

details and evidence leading up to and involving the shooting of LaVoy Finicum.

25. The killing of LaVoy, at the hands of FBI and OSP officers, was also a direct result

and/or was proximately caused by the wrongful, illicit and negligent actions of the FBI, BLM,

LOVE, LAURO, BRETZING, ASTARITA, HAMPTON, FERRARI, SPECIAL AGENT BM,

TROOPER 1, TROOPER 2 and other JOHN DOE defendants.

26. The killing of LaVoy Finicum, was also motived – as it relates to UNITED STATES,

FBI, BLM, LOVE, LAURO, and BRETZING - to the prior public protest of the Department of

the Interior and the BLM at and surrounding the Bundy Ranch incident in Bunkerville, Nevada

(described in more detail below) in March and April 2014.

27. The killing of LaVoy, at the hands of FBI and OSP officers was also a direct result and/or was proximately caused by a politically motivated plot originally conceived, implemented and / or deliberately assisted by plans, actions, and deliberate conduct of the BLM, BRETZING, LAURO, the STATE OF OREGON, BROWN, WARD, GRASTY, and other JOHN DOE defendants, related to public political protests of the Department of the Interior and the BLM in Harney County Oregon, related to the prosecution and imprisonment of Oregon ranchers Dwight and Steven Hammond, from October 2015 through January 2016, including specifically the related protest activities during the occupation of the Malheur National Wildlife Refuge from January 2, 2016 to January 26, 2016.

28. The killing of LaVoy, at the hands of FBI and OSP officers was also a direct result and/or was proximately caused by the plans, actions, and deliberate conduct of the BLM, BRETZING, HARNEY COUNTY, WARD, GRASTY, and other JOHN DOE defendants whose wrongful, negligent and/or unlawful conduct, including failure to train, failure to supervise, and failure to carry out known government policies and procedures, and as described more fully below.

29. This lawsuit is brought to obtain relief for LaVoy's surviving heirs, and to ensure that the idea of being shot in the back, by your own government, while trying to cross a county border to spread a political message, and while seeking protection by bona-fide law enforcement, from unhinged, overreaching, and corrupt federal and state officers, can return to being what it once was in the minds of American citizens - unthinkable.

**PARTIES**

30. Robert LaVoy Finicum's legal heirs are his wife and children who survived him after his brutal killing.

31. At all times herein mentioned, **Plaintiff D. Jeanette Finicum** ("Jeanette Finicum") was the wife of LaVoy Finicum and direct heir to her husband.

32. At all times herein mentioned, **Plaintiffs Thara Tenney, Tierra Collier, Robert Finicum, Tawny Crane; Arianna Brown, Brittney Beck, Mitch Finicum, Thomas Kinne, Challice Finch, James Finicum, Danielle Finicum** and **Tean Finicum** were the children of LaVoy Finicum and direct heirs to their father.

33. Plaintiffs are the heirs, and D. Jeanette Finicum is also the personal representative of the estate of Robert LaVoy Finicum pursuant to relevant state and federal law.

34. At all times herein mentioned, **Defendant UNITED STATES OF AMERICA** ("United States" or "UNITED STATES") is a proper defendant pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. and pursuant to the other basis and grounds for the causes of action listed below, and was at all times material hereto, the employer of Defendants GREG T. BRETZING, W. JOSEPH ASTARITA and other JOHN DOE defendants to be identified.

35. Timely notice was given of the claims pursued herein, to the UNITED STATES, pursuant to relevant law and administrative rules.

36. At all times herein mentioned, **Defendant FEDERAL BUREAU OF INVESTIGATION** ("FBI") was a public body and acting arm of the United States through the United States Department of Justice.

37. At all times herein mentioned, **Defendant BUREAU OF LAND MANAGEMENT** ("BLM") was a public body and acting arm of the United States Department of the Interior.

38. At all times material hereto, **Defendant Daniel P. Love** ("LOVE") was an agent of the United States Department of Interior, specifically the Bureau of Land Management, and was acting under the color of law and within the scope of his employment; separately but in

conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

39. At all times material hereto, **Defendant Salvatore Lauro** ("LAURO") was an agent of the United States Department of Interior, specifically the Bureau of Land Management Office of Law Enforcement Services ("OLES") Director and was acting under the color of law and within the scope of his employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

40. At all times material hereto, **Defendant Greg T. Bretzing** ("BRETZING") was an agent of the United States Federal Bureau of Investigation acting under the color of law, and within the scope of his employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

41. At all times material hereto, **Defendant W. Joseph Astarita** ("ASTARITA") was an agent of the United States Federal Bureau of Investigation acting under color of law and within the scope of his employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

42. Originally included as a John Doe defendant, **Defendant Michael Ferrari** ("FERRARI")

was an agent of the United States Federal Bureau of Investigation HRT team acting under color of law and within the scope of his employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

43. Originally included as a John Doe defendant, **Defendant Special Agent BM** ("SPECIAL AGENT BM") was an agent of the United States Federal Bureau of Investigation HRT team acting under color of law and within the scope of his employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

44. At all times herein mentioned, **Defendant STATE OF OREGON** ("State of Oregon" or "OREGON") is a proper defendant pursantto Oregon Revised Statute 2015 ORS 30.265 and other relevant Oregon laws as a "public body" subject to "civil action" and was at all times material hereto the supervisor, employer or controlling entity of the Oregon State Police, Katherine Brown, and other Oregon State Police officers included as John Doe defendants to be identified. Notice of the relevant claims contained herein was timely and properly given.

45. At all times herein mentioned, **Defendant OREGON STATE POLICE** ("OSP") is the title used to refer collectively to the individual Oregon State Police officers involved and described herein, and each OSP officer was at all relevant times herein an agent of the State of Oregon acting within the scope of his employment.

46. Originally included as a John Doe defendant, **Defendant Trooper 1** ("TROOPER 1") was an agent of the State of Oregon and OSP, previously identified in *USA v. Astarita*, 3:17-cr-

00226-JO as Trooper 1, and for the actions and conducted outlined herein was acting under color of law and within the scope of his employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

47. Originally included as a John Doe defendant, **Defendant Trooper 2** ("TROOPER  2") was an agent of the State of Oregon and OSP, previously identified in *USA v. Astarita*, 3:17-cr-00226-JO as Trooper 2, and for the actions and conducted outlined herein was acting under color of law and within the scope of his employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

48. Originally included as a John Doe defendant, **Defendant Travis Hampton** ("HAMPTON") was an agent of the State of Oregon  and OSP, acting under color of law and within the scope of his employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

49. At all times material hereto, **Defendant Katherine Brown** ("BROWN") was the Governor of Oregon, and an officer or agent of the State of Oregon, acting within the scope of her office or employment.

50. At all times material hereto, **Defendant Harney County** ("HARNEY COUNTY") is a public body organized and existing under the laws of the State of Oregon. Notice of this claim

was timely and properly given to Harney County.

51. At all times material hereto, **Defendant David M. Ward** ("WARD") was a resident of the State of Oregon, and the Sheriff of Harney County, acting under color of state law and within the scope of his office or employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

52. At all times material hereto, **Defendant Steven E. Grasty** ("GRASTY") was a resident of the State of Oregon, the Harney County Judge, and was acting under color of state law and within the scope of his office or employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

53. At all times material hereto, **Defendant The Center for Biological Diversity** ("CBD") was a national non-profit conservation organization headquartered in Tucson, Arizona and acting through its directors and executive officers.

54. At all times material hereto, Defendants John Does 1-100 ("DOES" or "JOHN DOE" or "JOHN DOES"), were agents of the United States or the State of Oregon and acting under color of law and within the scope of his or her employment.

55. The true names and capacities of JOHN DOE defendants are unknown to Plaintiffs at this time. When their true names and capacities are ascertained, Plaintiffs will amend this complaint by inserting their true names and capacities herein. Plaintiffs are informed and believe and thereupon allege that each of the fictitiously named Defendants is responsible in some manner

for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by those Defendants.

56. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to each and/or all Defendants sued under fictitious names.

57. Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned, except for Defendant Center for Biological Diversity, each of the Defendants including all Defendants sued under fictitious names, was/were the agent and employee of either the United States, the State of Oregon, or Harney County and in doing the things hereinafter alleged, was/were acting within the scope of the relevant entity and/or his or her employment.

## JURISDICTION

58. Claims in this action arise under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

59. Further, this Complaint raises civil rights claims against individual federal employees and officers pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

60. The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(3) (civil rights) and 28 U.S.C. § 2671 (federal tort claims).

61. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because the 42 U.S.C. § 1983 violations, the *Bivens* tort claims, and tort liability for the state law claims arise from a common nucleus of operative facts.

62. Venue lies in the District of Oregon, the judicial district in which the claim arose, pursuant to 28 U.S.C. Section 1391(b)(2) and 1391(e)(1).

63. Plaintiffs do not agree to the applicability or constitutionality of limits on liability or other provisions of the Oregon Tort Claims Act and reserve the right to name additional

individual defendants as warranted by law or fact and to challenge any limits on liability set on any of the causes of action listed below.

64. Plaintiffs have complied with all applicable notice and statutory requirements of both the Oregon and federal Tort Claims Acts.

## STATEMENT OF FACTS

*BUNKERVILLE - 2014*

65. On the morning of April 12, 2014, LaVoy Finicum was present in Bunkerville, Nevada as part of a political protest against a BLM cattle impound operation and against federal government overreach generally.

66. The protest was also in support of Nevada Rancher Cliven Bundy and his family, who had been targeted for violence by the BLM and the FBI.

67. In fact, LaVoy had learned that in the two-weeks leading up to April 12, 2014, special agents with the BLM and FBI had targeted Bundy, that the federal government had surrounded Bundy's house with militarized and armed government snipers and surveillance personnel and had violently engaged two of Cliven Bundy's sons (Dave Bundy and Ammon Bundy) and BLM and / or FBI agents had threatened violence against other members of the Bundy family.

68. LaVoy had learned, early in the morning on April 12 (or possibly the night before), that the leadership of the BLM and Department of Interior in Washington D.C., had agreed to suspend the cattle impound operation in Bunkerville, and had also announced that its agents and officers were going to be leaving the area and returning the Bundy cattle that had been gathered.

69. As a result of learning that the BLM and other government officers would be leaving Bunkerville and returning the Bundy cattle, LaVoy and other individuals believed that the protest had been politically effective and that the conflict was resolved.

70. Later on April 12, 2014, as LaVoy and other volunteers peacefully gathered near the cattle impound area, they discovered that a faction of the BLM (lead by BLM Agent LOVE) and other government agents and officers had taken up an aggressive, military style posture and were refusing to leave or surrender the cattle.

71. Unbeknownst to LaVoy at the time, this same faction of government agents, operating under the direction and authority of Defendant LOVE had been previously involved in fabricating misleading evidence against Cliven Bundy, and had also been involved in seeking to intentionally provoke a violent confrontation with Bundy and his supporters.

72. This same faction of government agents, under the direction of BLM Agent LOVE and other JOHN DOE defendants, had intentionally created misleading threat assessment documents, and knowingly disseminated false and misleading information to other federal agents and local law enforcement officers about Bundy and his supporters, including about LaVoy Finicum.[6]

73. Later on April 12, 2014, LaVoy saw first-hand, while he was at Bunkerville, that the conflict between peaceful political protestors and rogue overreaching federal agents acting under the direction of BLM Agent LOVE, was resolved when the local Sherriff's department intervened, and when the local Sherriff's actions caused the rogue government agents to back down and to disband.

74. Internal FBI documents verify, and it is in-fact true, that when the local Clark County

---

[6]     It is now known that the government's own internal investigation discovered that Defendant Love acted "recklessly" but with the specific direction of a John Doe defendant named above, upon information and belief the BLM Deputy Director" to "set in motion a chain of events that nearly resulted in an American tragedy with mass loss of life." Further, the government's lead internal investigator concluded "reckless and unprofessional conduct with BLM Law Enforcement supervisory staff was apparently widespread, widely known" and covered- up, and that other government employees were "either too afraid of retaliation, or lacked the character to report and/or correct" the misconduct.

Sherriff's office arrived on sight in Bunkerville, on April 14, 2014, several BLM and other federal agents saw the Sheriff's department as hostile and aligned with the protesters.

75. Specifically, law enforcement investigative records prepared as part of an internal investigation into the April 12, 2014 events show, and it is in-fact true, that the Sheriffs' office also brought in its own SWAT Team. Further, the Sheriff's own snipers and other strategically placed personnel set up counter positions – with and alongside the protesters, taking up strategic positions against the federal agents, pointing their guns (that is the Sheriff's SWAT snipers were pointing their guns) at the rogue federal agents – and not at the protestors.

76. This action by the local Sheriff's department sent a clear message to BLM Agent LOVE and those acting under his command, regarding the untenable position and conduct of the federal agents – who had previously been threatening over a loud speaker to shoot protesters.

77. That same day, LaVoy also observed and came to understand that with the intervention of several Clark County Nevada Sheriff deputies, the threat presented by these rouge government agents - to protestors, bystanders and the observing public, was dissipated, and resolved.

78. LaVoy also saw that Defendant LOVE retreated and released the Bundy cattle and removed all of the federal officers and government staff from the Bunkerville operation – as the BLM and Department of Interior executives had previously publicly announced and published.

79. LaVoy, along with several others, including Defendant LOVE, witnessed that all harm and potential violence had been avoided following the intervention of and on-site engagement by the local county Sheriff's office.

80. From the evening of April 11, 2014, through at least mid-day on April 12, 2014, Defendant LOVE instructed officers and federal agents – including several JOHN DOE defendants, to systematically destroy documents and information about the false and misleading

threat assessments, and other information about protesters in Bunkerville, including information about LaVoy.

81. Specifically, among other actions to be proven at trial, Defendant LOVE ordered and/or supported a massive shredding operation to hide or conceal information prior to abandoning the operation at Bunkerville. As part of this effort, on April 11, 2014 and April 12, 2014 Defendant LOVE had been on multiple phone conversations with DOJ, DOI and BLM leaders in Washington D.C., and with Nevada Senator Harry Reid, and local DOJ officials. During these calls, Agent LOVE expressed his vehement disagreement with the decisions of DOJ, DOI and BLM leadership in D.C., and made notes regarding his expressions and disagreements in his operational notebook and on several laptop computers that Agent LOVE used in the course of his duties.

82. Agent LOVE's notebook and laptops were intentionally and purposefully hidden or destroyed by the UNITED STATES, and all such records and notes made and kept by Agent LOVE, according to the UNITED STATES, have now disappeared from the government's custody and control.

83. Based upon the UNITED STATES' subsequent internal investigation, it is now known that "there was an improper cover-up in virtually every matter" that Defendant LOVE participated in, including the Bunkerville, NV operation in 2014 and the post-Bunkerville targeting of individuals related to the Bundy family, including specifically, LaVoy Finicum.

84. The UNITED STATES' internal investigation of Defendant LOVE and other JOHN DOE defendants after April 2014 revealed, and it is in-fact true, that they (LOVE and his colleague rogue agents) had intentionally planned and carried out the "most intrusive, oppressive, large scale and militaristic" operation in Bunkerville, NV in 2014, as possible, and

that it was Defendant LOVE and JOHN DOE defendants purpose and intention to engage Cliven Bundy and his supporters (including LaVoy Finicum) in a manner that constituted "excessive use of force, civil rights and policy violations."

85. It was further the purpose and intention of LOVE and other JOHN DOE defendants to solve a political dispute with Cliven Bundy and his supporters, and to silence political dissent, protest and petitioners for redress against federal government overreach, including specifically against BLM and other DOI actions.

86. During the Bunkerville events of 2014, LaVoy was identified (among many other protesters) by Defendant LOVE and other JOHN DOE defendants, as a target of their activities, and specifically as a target for using violence, meaning Defendant LOVE and other JOHN DOE defendants intentionally planned to use violence against LaVoy Finicum and others for the unlawful and wrongful purposes listed above.

87. This illicit targeting of LaVoy and other protesters who Defendant LOVE and JOHN DOE defendants viewed as hostile to the BLM and / or critical of BLM and DOI actions, decisions and conduct, began on April 14, 2014 and continued through at least January 26, 2016.

88. In furtherance of this targeting, and as a direct or proximate result of efforts by LOVE and other JOHN DOE defendants, both the BLM and the FBI kept an active file on LaVoy.

89. Defendant LOVE, in cooperation with and with assistance from the CENTER FOR BIOLOGICAL DIVERSITY and other JOHN DOE defendants fabricated information, edited, omitted or reported misleading information from this file, and added misleading information to this file, for the purpose of intentionally creating the false impression that LaVoy Finicum (along with other BLM and DOI protesters) was associated with militia, militia groups or other violent individuals and presented a risk of violence to law enforcement when no legitimate threat

assessment or legitimate intelligence information supported or justified that conclusion.

90. In fact, except for the information tainted by the misconduct of Defendant LOVE, the CENTER FOR BIOLOGICAL DIVESITY and other JOHN DOE defendants, there was no credible information in the possession of any law enforcement agency, prior to January 2016, to indicate or support a finding that LaVoy constituted a threat to law enforcement or that he posed a real or credible possibility of violent confrontation with anyone – let alone federal agents.

91. Further, Defendant LOVE, the CENTER FOR BIOLOGICAL DIVERSITY and several JOHN DOE defendants (including agents within the BLM and the FBI) knowingly concocted a deceptive narrative through the use of false, fabricated and falsely reported information, that LaVoy and others who were present in Bunkerville, Nevada on or about April 12, 2014, and who were also publicly critical of the BLM and DOI (such as Cliven Bundy's sons Ammon Bundy, Ryan Bundy) were anti-government domestic terrorists.

92. Defendant LOVE, the CENTER FOR BIOLOGICAL DIVERSITY and several JOHN DOE defendants knew this information and narrative was false, knew that LaVoy was not a domestic terrorist, and knew or reasonably should have known that by falsely labeling LaVoy as this kind of threat, that it would increase the likelihood that LaVoy (and the others targeted) would be met with unjustified violence, excessive force and escalated tension from law enforcement.

93. Defendant LOVE, the CENTER FOR BIOLOGICAL DIVERSITY and several JOHN DOE defendants knew that the purposeful creation and use of this false information violated government policy, governmental guidelines, and that they were violating the constitutionally protected due process and Fourth Amendment related rights of Mr. Finicum.

94. Defendant LOVE, the CENTER FOR BIOLOGICAL DIVERSITY and several JOHN

DOE defendants intentionally created, used, disseminated and/or assisted and willfully cooperated in this intentional deception to accomplish the political objectives listed above.

95. Following the Bunkerville, Nevada events in 2014 and continuing through January 2016, LaVoy began a YouTube channel where he periodically published educational videos explaining his political views, his views on the US Constitution, and where he also described how he viewed the federal government when it was acting beyond its lawful limits imposed by the Constitution and by federal law.

96. In LaVoy's YouTube videos he was also particularly critical of the Department of the Interior and the BLM.

97. From April 2014 through January 2016, LaVoy also continued operating his own cattle ranch and cattle operation which he purchased in 2008, and which included the grazing of cattle in Mohave County, Arizona and in Kane County, Utah.

98. From April 2014 (the date of the Bunkerville, Nevada protests) through at least February 2017 (the date of certain whistleblower-like activity from BLM Agent Wooten), the BLM and the FBI conducted an extensive investigation of what had transpired in Bunkerville, NV, regarding both the lead up to and the events that took place on April 2014.

99. This investigation generated a substantial amount of law enforcement data, information and intelligence within the FBI and BLM, including information on and about LaVoy Finicum.

100. The data, information and intelligence generated by the investigation, included significant and substantially misleading and false material generated by, edited, amended and/or derived from deliberate acts of Defendant LOVE, the CENTER FOR BIOLOGICAL DIVERSITY, Defendant SALVATORE LAURO, Defendant BRETZING, and other JOHN DOE defendants.

101. Defendant LOVE, the CENTER FOR BIOLOGICAL DIVERSITY, Defendant

SALVATORE LAURO, Defendant BRETZING, and other defendants deliberately engaged in this conduct, in part, to concoct a deceptive narrative of what happened at Bunkerville, NV in April 2014, and to purposefully and misleadingly paint Cliven Bundy, LaVoy Finicum, Ammon Bundy, Ryan Bundy and others, in a false light with the media, the public, state and federal law enforcement, and with government personnel or agents involved in any future court actions.

102.    The intended false light was that these men, including specifically LaVoy Finicum, presented a physical threat to federal agents and to the public.

103.    A purpose (shared by LOVE, CBD, LAURO, BRETZING and other defendants) of this intended false light was also to silence and/or discredit LaVoy's political speech, to silence and/or discredit Bundy supporters, and to silence and discredit vocal critics of the BLM and the DOI – including through the use of violence, unprovoked force, excessive force and other anticipated physical confrontations with government agents, officers, officials and law enforcement personnel.

104.    Defendants LOVE, CBD, LAURO, BRETZING and these other defendants knew this information and the narrative they had created about what took place in Bunkerville, Nevada in April 2014 was false, and they knew that in labeling LaVoy and others in this way, they were causing harm to LaVoy and that they were violating government policy, governmental guidelines, and that their efforts violated the Constitutional due process rights of LaVoy and the other citizens involved.

105.    Without any warrant, and without any probable cause to believe he had committed any crime, after April 2014 and through January 2016, at various times, Defendants LOVE, LAURO and BRETZING and other John Doe defendants monitored and tracked LaVoy's YouTube videos and related activities online.

106.     Additionally, between April 2014 and January 2016 on at least one occasion, other John Doe defendants, including JOHN DOE FBI agents and informants acting under the direction of JOHN DOE defendants and in cooperation with LOVE and BRETZING; monitored, surveilled and surreptitiously entered into LaVoy's home – without his knowledge or consent.

107.     DOI BLM Special Agent Larry C. "Chuck" Wooten, who lead the post-Bunkerville investigation for the Department of the Interior and the BLM (including OLES), recently revealed, and it is in-fact true that Defendants LOVE, LAURO and JOHN DOE defendants intentionally covered up or otherwise intentionally failed to disclose "substantive and exculpatory" information that contradicted the narrative created about Bunkerville, Cliven Bundy, and other critics of the federal government such as LaVoy Finicum.

108.     Mr. Wooten's investigation also concluded, and it is in-fact true that other DOJ personnel (including JOHN DOE defendants) became aware of the rogue faction of government agents operating under and/or in concert with Defendants LOVE and BRETZING and also became "generally aware" of the misconduct described herein, including "likely civil rights and excessive force issues" and in response the DOJ adopted a "don't ask, don't tell" mentality and approach to the false narrative and other harmful and illicit actions being taken by the UNITED STATES in relation to LaVoy and other supports of Cliven Bundy.

109.     These same federal employees who held high level and supervisor positions over this subject matter (meaning both what happened in Bunkerville in April 2012, and with regard to the targeting and false narrative perpetuated against LaVoy and others -as described above) intentionally "discouraged the reporting" of misconduct and further discouraged the reporting of "evidence favorable to" Cliven Bundy and his supporters (which also included LaVoy Finicum).

110.     The UNITED STATES' internal investigation has also now revealed, and it is in-

fact true, that the "talking points" used by the DOJ to describe what happened in Bunkerville in 2014 were "factually incorrect" and that LOVE and other JOHN DOE defendants knew of the incorrect and/or misleading and intentionally failed to take actions to make corrections.

111.    Further, the UNITED STATES' internal investigation concluded, and it is in-fact true that the Bundy "impound" operation in 2014 was largely a ruse, that the government's official explanation about Bunkerville, Cliven Bundy and Cliven Bundy's supporters was the result of "cover-ups", "half-truths" and an intentionally "skewed narrative[.]"

112.    The Bunkerville operation lead by LOVE and other JOHN DOE defendants both leading up to April 2014, during April 2014, and in the related efforts afterwards, was in-fact a rogue operation full of widespread governmental wrongdoing by Agent LOVE, Agent LAURO and other JOHN DOE defendants from beginning to end, and the whole matter as "a punitive and ego driven expedition" designed to intentionally, illicitly and harmfully target Cliven Bundy and his supporters, including eventually LaVoy Finicum.

113.    The UNITED STATES' investigation also concluded, and it is in-fact true that what had happened in the run up to the Bunkerville operation, the events of April 2014, and the post-Bunkerville investigation "would shock the conscious of the public and greatly embarrass" the federal government if fully disclosed.

114.    Nevertheless, the false and misleading information, this history of widespread misconduct, and scheme and plans described above, and the deliberate activities and actions taken by Defendants LOVE, LAURO, BRETZING, CBD and the other above-named defendants and JOHN DOE defendants, contributed directly and /or proximately to the subsequent lead up, preparation, operation planning, and events on January 26, 2016, including specifically the wrongful and illicit shooting death of LaVoy Finicum.

115.     In November 2015, Cliven Bundy's son Ammon Bundy traveled to Harney

County, Oregon to meet with Dwight and Steven Hammond and their family. A brief

background is important to understand the relevance of this trip and subsequent events, which

culminated in the shooting death of LaVoy Finicum.

## STATEMENT OF FACTS

*HARNEY COUNTY, OR (2015 – 2016)*

116.     Beginning in or about October 2015, the story of Oregon ranchers Dwight and

Steven Hammond had been circulating across the national news and social media, and quickly

was connected to the events and individuals involved that had been involved in Bunkerville,

Nevada in 2014, including both individuals in government and individual protesters.

117.     The public story of the Hammonds included a description of events from back on

June 21, 2012, when Dwight and Steven Hammond were convicted of felony charges for

allegedly setting fires on public land after a long and public dispute with the federal government,

including specifically with the BLM and DOI. At sentencing, the federal district court judge

declined to apply the five-year mandatory minimum sentence required by statute, after finding it

"grossly disproportionate to the severity of the offense" and also a "violation of the Eight

Amendment." *See* 10/30/2012 Sentencing Hrg. at 26:3–6, *United States v. Hammond, et al*, Case

No. 6:10–cr–60066–HO.

118.     The Hammonds legal matter became more public on February 7, 2014, and drew

the attention of several Bunkerville personalities including Cliven Bundy, Ammon Bundy, after

both Dwight and Steven Hammond had completed their prison sentences from the above case,

and the Ninth Circuit Court of Appeals subsequently concluded that the district court erred in not

applying the mandatory five year minimum sentence and resentenced (in Oct. 2015) the

Hammonds. The resentencing meant that the Hammonds were required to go back to federal prison for the remainder of 5-year sentences and to self-surrender on January 4, 2016.

119. As this story of the Hammonds treatment and circumstances spread via traditional and social media, beginning in approximately October 2015, and continuing through December 2015, local Harney County, Oregon residents and other citizens from across the United States began arriving in Harney County, Oregon to protest the government's actions, including the BLM and DOI actions related to the Hammonds.

120. Protesters also began to publicly speak out against the general treatment of ranchers and the ranching community by the BLM, and other divisions of the DOI, as well as other types of misconduct and overreach by the federal government generally.

121. In November 2015, modeled after actions taken by protesters in Bunkerville in 2014, and lead in part by Cliven Bundy's sons Ammon Bundy and Ryan Bundy, several thousand people and several concerned organizations signed a "NOTICE: Redress of Grievance," raising political issues that the Hammond case brought to the surface.

122. The notice was sent to Harney County Sheriff Defendant DAVID M. WARD. The notice was also sent to the Harney County Commissioners, Defendant STEVEN E. GRASTY; local Justice of the Peace Donna Thomas, local District Attorney Tim Colahan, Oregon Attorney General Ellen Rosenblum, and Oregon Governor, defendant KATHERINE BROWN.[7] Signers included the Bundy family, and eleven other entities and organizations.

123. On November 20, 2015, Defendant WARD published a letter to the public replying to the "huge response from American citizens" that his office was receiving regarding

---

[7] *See* https://www.oathkeepers.org/a-new-resolution-put-out-by-ammond-bundy-concerning-the-hammond-family/  (last visited Apr 18, 2016).

the Hammond case.

124.      By December 30, 2015, media sources were reporting how local Harney County, OR citizens had begun forming organizations and joining the protests and growing concerns about civil unrest in Harney County due to the lack of meaningful response from government officials, including a lack of meaningful response from WARD and GRASTY.

125.      In response, among other actions, Acting United States Attorney Billy J. Williams published a letter to the public entitled, "To The Citizens of Harney County, Oregon," stating his "respect" for the rights of these "outside individuals and organizations" to "peacefully disagree with the prison terms imposed" on the Hammonds, but explained that no injustice was occurring.[8]

126.      As of the date of the letter from Billy J. Williams, and at no time thereafter had LaVoy Finicum ever become a member of any of the above-referenced political organizations and he was not then, had never before been, and never thereafter became a member of any militia group.

127.      In fact, as of December 2015, LaVoy was not in Oregon and had no plans to be involved in the Oregon events described above.

128.      However, as of December 2015, both Ammon Bundy and LaVoy Finicum had used their experience at Bunkerville to educate the public, to advocate their political ideas and to spread their individual messages of responsible citizen activism against federal government overreach.

129.      By this time LaVoy had written and published a book (on June 20, 2015), and had

---

[8] *See* Billy J. Williams, "To the Citizens of Harney County, Oregon," available at https://www. documentcloud.org/documents/2660399-Statement-USattorney.html (last visited Apr 18, 2016).

been conducting small group symposiums on the principles of freedom, and in particular related to western land issues.

130.    Ammon Bundy had similarly increased his civic profile, volunteering his time giving seminars in different public forums – elementary schools, cottage meetings, and other public gatherings – on the importance of adhering to the structure of the Constitution to resolve political disagreements and on specific land rights issues.

131.    By late December 2015, Ammon had met with several government officials in Oregon, including multiple meetings with the local sheriff, Defendant WARD, to try and find a way to protect the Hammonds from further injustice. He was also sharing his observations and judgment to local, county, state and national government leaders that they should do more to acknowledge citizen's concerns.

132.    On January 1, 2016, LaVoy received a phone call from Ammon's brother Ryan Bundy explaining that large groups of protesters in Harney County, Oregon had planned a protest parade and a show of support and love for the Hammonds and their family.

133.    Later that day, LaVoy traveled with Ryan Bundy and others, more than 700 miles to Burns, Oregon so that they could participate in the planned parade and show of support for the Hammonds.

134.    What LaVoy, Ryan, and Ammon did not know, and it is in-fact true that the BLM and FBI had been monitoring the social media posts of each of them, and had also been monitoring events in Harney County, Oregon.

135.    As part of this monitoring, BLM and FBI leadership and personnel in Oregon had been coordinating with Defendant LOVE, BRETZING and other defendants and had received the misleading information and individual profiles put together or modified by Defendant LOVE,

other defendants, and other JOHN DOE defendants, after Bunkerville. False information and misleading information provided and gathered by the CENTER FOR BIOLOGICAL DIVERSITY was also included in these profiles.

136.     Further, by this time, the FBI and BLM leadership had used the information and assistance of JOHN DOE defendants, including the misleading and false information created after Bunkerville, as described above, to enlist the support and cooperation of Defendant GREG T. BRETZING, Defendant KATHERINE BROWN, Defendant HARNEY COUNTY, Defendant DAVID M. WARD, Defendant STEVEN E. GRASTY and other defendants.

137.     Prior to January 1, 2016, JOHN DOE defendants, with the assistance of Defendant BRETZING, BROWN, WARD and Defendant GRASTY distributed the false and misleading information and profiles, including false and misleading information about LaVoy Finicum, to other influential government decision makers in and around Harney County.

138.     LOVE, BRETZING, BROWN, WARD and GRASTY were each individually aware that some of the information in the profiles was false and/or misleading or were intentionally reckless in this regard, and nevertheless chose to cooperate, chose to assist each other, and chose to continue spreading the false and/misleading information for the political purpose of silencing political opposition, including specifically silencing and/or discrediting LaVoy Finicum.

139.     As a result of the false and misleading information being spread by the defendants in this matter, local, state and federal law enforcement created specific plans and operational objectives – which plans and objectives were crafted in specific ways to address the false conclusions and false narrative advanced by Defendants LOVE, BRETZING, LAURO and as of January 2016, also advanced by Defendants WARD, GRASTY, and BROWN. Each of these

defendants were knowingly and deliberately united in a common political cause that they know, or reasonably should have known, would cause unjustified force, excessive force and / or other illicit harm to LaVoy and to other protesters.

140.     On January 2, 2016, most of the previously unorganized protesters in Harney County, Oregon participated in a parade and show of support for the Hammonds.

141.     In the late morning or early afternoon on January 2, 2016, Ammon Bundy organized a small group of protestors who had been participating in the parade and public protest, and proposed an idea that was designed to increase public awareness of the Hammond's plight, increase political pressure on government officials to address related injustices being perpetuated in Harney County, Oregon by the BLM and other federal agencies, and that would remove the bulk of protest activity from the center of Burns, Oregon so that the protest would be less disruptive to the average local citizens and businesses.

142.     Specifically, Ammon proposed the protest be organized and removed from the town, to the more remote location of the Malheur National Wildlife Refuge (approximately 30 miles out of town).

143.     The Refuge had played a central role in the Hammonds' controversy and it was also central to several of the other political disputes in and around Harney County, particularly related to federal government overreach and abuses by the BLM.

144.     LaVoy had no advance knowledge or awareness of Ammon Bundy's plan, and had arrived in Burns, Oregon on January 2, 2016 planning only to participate in the parade and show of support for the Hammonds.

145.     When Ammon Bundy shared his ideas and proposal initially, he asked a small group of individuals to meet with him, and this included one of the local Harney County deputy

sheriffs, who also openly attended Ammon's meeting.

146.     As it turned out, approximately two dozen individuals attended, including LaVoy and Ryan Bundy.

147.     At this January 2, 2016 meeting, Ammon Bundy proposed there should be an organized and focused expansion of the protest, and that the effort should be principled, non-violent, and lawful.

148.     During the course of the meeting Ammon proposed a specific plan based upon his understanding of, among other things, the principles of lawful adverse possession.

149.     Specifically, Ammon proposed that since the Refuge was empty for the holiday, that the protesters undertake an earnest and lawful effort to stake an adverse possession claim to the Refuge, which effort – he anticipated - would trigger a legal battle in the Oregon state courts, where the BLM and other related federal government agencies would have to prove the lawfulness and legal authority of their activities, their alleged ownership of land, and the jurisdiction and authority they claimed as the basis for their presence and operations in Harney County, Oregon, including at the Refuge.

150.     Ammon Bundy and several other individuals who were present at the meeting had learned that the Refuge was currently unoccupied and that no government employees or officers were present.

151.     Accordingly, Ammon encouraged the organization of a responsible group of individuals who would travel, in advance, to the Refuge, and verify that it was unoccupied. Then, this advance group would commence staking the claim and setting up the necessary requirements for an earnest attempt to establish a lawful claim for adverse possession of the Refuge property.

152.     The idea expressed by Ammon Bundy and agreed to by the participating

protestors like LaVoy, was that among other grounds in support of their protest action, there was a legitimate property law basis for attempting an adverse possession, and that because this was permitted by both state and federal law, it could also be used as a viable method of political protest. If successful, the occupiers of the Refuge would assist Harney County and its residents in furthering legitimate and lawful aims related to the land they would occupy, and, if unsuccessful, the *attempt* to establish a lawful adverse possession claim would still focus the protest message, generate necessary media attention, and stimulate a broader national discussion of land use issues and the problem of federal overreach, including questions raised regarding Article I, Section 8, Clause 17 of the U.S. Constitution.

153.     One of the goals of the protest and adverse possession of the Refuge was to acquire legal standing – to bring the question of federal land overreach to state and/or federal court attention or to require the federal government to make solid and legitimate arguments in support of its claim of ownership of the Refuge land.  With that newly acquired standing, the goal of the protesters was to open up a legal forum to raise the growing demands for redress on important land and property rights issues in Harney County, and as an example for others.

154.     As part of the execution of his idea, Ammon Bundy tried to ensure that the effort to establish a lawful adverse possession claim was legitimate, taking reasonable precautions to ensure that the legally recognized "disseizors" (the occupiers) could protect themselves and the adversely possessed property against any unlawful force (which is a specific requirement of adverse possession law). The plan was also to ensure that such activities were open, public, notorious, orderly and supervised by responsible individuals who possessed the necessary real life experience to responsibly initiate the adverse possession claim.

155.     All this was planned in general accord with what Ammon Bundy, LaVoy and

other occupiers believed to be well-established principles of adverse possession law.

156.     LaVoy was one of those individuals at the January 2 meeting who agreed to head out to the Refuge, in advance, and see if it was going to be possible to set-up a lawful adverse possession claim on the Refuge grounds.

157.     Upon arriving at the Refuge, LaVoy and others began the process of formally staking a claim, under the principles of law he understood were applicable and necessary to state and federal adverse possession legal requirements.

158.     As part of this adverse possession, the protestors ultimately changed the name of the Refuge to the Harney County Resource Center (the adverse possession was being undertaking in the interests of the residents of Harney County, Oregon), they published new signs, changed responsibility for the payment of utilities and services, and took other specific steps the they understood were required by law to establish the legitimate control and use of the Refuge property, as outlined in standard adverse possession law treatises.

159.     As part of the organized protest, Ammon and LaVoy became the most visible spokesmen for the adverse possession occupation and related protest. They continued to organize, spread their message, and invite people to the new Harney County Resource Center.

160.     During the occupation, Ammon Bundy and LaVoy also conducted open public seminars, meetings, and press releases. They ensured that regular care and maintenance of the property was conducted, they began cleaning, maintain and improving the property, and using the records and resources available at the Refuge otherwise worked to expand the use of adverse possession and other lawful methods to investigate and establish claims throughout the area.

161.     As they understood the relevant law, the occupation of the Refuge was open, hostile and notorious (these are all specific requirements the protesters understood were the legal

requirements for a legitimate adverse possession claim.)[9]

162.    At the outset of the Refuge occupation, Ammon Bundy, LaVoy and the other occupiers also established appropriate caretaker responsibilities including securing the previously vacated property, setting up a perimeter watch, and controlling ingress and egress. They named themselves **Citizens for Constitutional Freedom**, publicly announced the formation of their association and began publishing material and press statements online in that name from January 2, 2016, through January 26, 2016.

163.    From January 2 to January 26, 2016, approximately 1,000 individuals, including businessmen, ranchers, political protestors, elected officials from different branches of state

---

[9] *See e.g. Robin v. Brown*, 162 A. 161, 161 (1932). In order to exercise a legitimate adverse possession claim, "[t]he disseisor must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest. He must intend to hold the land for himself, and that intention must be made manifest by his acts. It is the intention that guides the entry and fixes its character. No particular act, or series of acts, is necessary to demonstrate an intention to claim ownership. Such a purpose is sufficiently shown where one goes upon the land and uses it openly and notoriously, as owners of similar lands use their property, to the exclusion of the true owner." Further, in *Springer v. Young*, Justice Strahan explains: "An adverse possession cannot begin until there has been a disseizin; and, to constitute a disseizin, there must be an actual expulsion of the true owner for the full period prescribed by the statute. An adverse possession is aptly defined by INGERSOLL, J., in *Bryan v. Atwater*, 5 Day, 181, to be "a possession, not under the legal proprietor, but entered into without his consent either directly or indirectly given. It is a possession by which he is disseized and ousted of the lands so possessed." It should, therefore, come as no surprise to anyone, let alone the government or this court that the Refuge occupation involved "an ouster" and "a disseisin" and such actions are hardly new or un-established legal theories, and do not suggest that the character or trustworthiness of those who seek to setup a lawful adverse possession claim, is lacking. To the contrary, the specific steps and lengths to which these occupiers endeavored, including the establishment of a perimeter, the changing of the sign and renaming of the facility, the taking over of routine maintenance and cleaning, and the managing and control of the of the property, all show that this was no random or spontaneous act of dangerousness or recklessness, but a careful attempt at exercising a lawful right – including under federal statute. As the Texas Court of Appeals recently instructed, "No matter how exclusive and hostile to the true owner the possession may be in appearance, it cannot be adverse unless accompanied by intent on the part of the occupant to make it so. There must be an intention to claim the property as one's own to the exclusion of all others." *NAC Tex Hotel Co. v. Greak*, No. 12-14-00260-CV, 2015 WL 7019738, at *3 (Tex. App. Nov. 12, 2015).

executives and legislatures, attorneys, and federal government employees – all came and went to and from the Refuge, without interference from the local, state or federal government.

164. From January 2 to January 26, 2016, there was no legal notice, warrant or arrest related to the adverse possession of the Refuge. No civil or criminal legal proceedings were initiated, and no notice of trespass or any other notice was provided to Ammon Bundy, LaVoy or any other leader of the Refuge occupation – or otherwise posted at the Refuge.

165. As part of their role and responsibility for controlling ingress and egress to establish the attempted claim of adverse possession, the Refuge occupiers (including LaVoy specifically) happily welcomed visitors – of all kinds. The leaders of the occupation also freely came and went from the Refuge, regularly attended meetings in and around Burns, Oregon – making no secret of their travels, and on multiple occasions seeking meetings with local, state and federal law enforcement officials.

166. There was nothing surreptitious or stealthy about the adverse possession of the Refuge or the related First Amendment political protests and petitions for redress.

167. However, Defendants BRETZING, BROWN, WARD, GRASTY and other defendants worked individually, and intentionally cooperated with each other, to intentionally and deliberately to control the official narrative of what was taking place at the Refuge. As part of their individual actions, and as part of the actions they undertook together and in cooperation with each other, Defendants BRETZING, BROWN, WARD, GRASTY and other defendants intentionally spread false, misleading and inaccurate statements about the occupiers and the adverse possession of the Refuge.

168. Further, despite the plain appearance of the occupiers' steps to stake the adverse possession claim, and despite the repeated entreaties by the occupiers to civilly engage and

communicate with state and local officials in furtherance of their adverse possession activities, Defendants BRETZING, BROWN, WARD, GRASTY and other defendants never once publicly admitted the true nature of the occupation as an attempted lawful adverse possession. Further, these same defendants never once candidly explained to the public that the normal legal remedy against an adverse possession claimant was formal notice and possible trespass charges.

169.        Further, these same defendants ignored legal advice and legal counsel that they sought out and that they received, which counsel suggested and instructed that the appropriate course of action would be legal notice and possible trespass charge – by local law enforcement and local civil court actions.

170.        Further, these same defendants, individually and collectively were informed by county, state and / or federal attorneys that no local or federal laws had been identified as having been broken by the occupation.

171.        Further, motivated by a political agenda that was hostile to the political protests taking place at the Refuge, these same defendants, despite having been so informed, intentionally hid, obfuscated, and withheld the legal advice and information they were given and the true nature of what was taking place from the public. Further, the UNITED STATES intentionally withheld information from state government officials that adverse possession of a federal wildlife refuge had been previously attempted as an act of political protest, and that in prior adverse possession attempts, normal trespass proceedings had been employed and used to peacefully resolve a prior refuge occupation.[10]

---

[10] *See, for example, In re Timmons*, 607 F.2d 120, 122 (5th Cir. 1979). This case is the only other identifiable situation where a group of political protesters took over a federal wildlife refuge, claiming to exercise adverse possession. Significantly, the government in that case did not call for militarizing the surrounding community, calling in federal law enforcement or solving the situation through force, but instead local prosecutors and local law enforcement went out and

172.     Neither the UNITED STATES nor the STATE OF OREGON sought or pursued court action against the occupation or the occupiers to end the occupation. Instead, Defendants BROWN, BRETZING, WARD, GRASTY and other defendants willfully decided to fight a public political battle, and demanded that the FBI, BLM, and DOJ take the lead and bring the occupation to a close by force.

173.     BROWN  WARD, GRASTY and other defendants were also motivated, at least in part, by the false and deceptive information and profiles created and/or manipulated before, during and after Bunkerville by LOVE, LAURO and BRETZING.

174.     BRETZING, BROWN, WARD, GRASTY and other defendants also deliberately and willfully chose to accept, use and disseminate information that they knew was false, incomplete and misleading, including information about LaVoy.

175.     Further, as part of their agenda, Defendants BRETZING, BROWN, WARD, GRASTY and other defendants deliberately targeted LaVoy and a few others, as supposed domestic terrorists – and used this label – which they knew was a false allegation, as a pretext for an enormous federal government intervention in Burns, Oregon.

176.     Further, the use of this false label was deliberately employed as a political and tactical strategy by Defendants BRETZING, BROWN, WARD, GRASTY, the UNITED STATES generally, the STATE OF OREGON generally, and HARNEY COUNTY generally, and by other defendants, to purposefully and dramatically escalate the tensions in the Burns, Oregon community and to knowingly and intentionally escalate the risk of physical harm to all involved, including to LaVoy Finicum.

---

met with the occupiers and gave them a simple trespass notice. This ultimately resolved the protest and adverse possession claim without violence.

177.     Prior to January 26, 2016, Defendants BRETZING, BROWN, WARD, GRASTY and other defendants knew that the threat assessments and threat related information about LaVoy and others – that was being used and relied upon by local and federal law enforcement personnel, was false and misleading, but encouraged other law enforcement agents and officers, and other elected officials to believe it, and act upon it anyway.

178.     Additionally, Defendants BRETZING, SPECIAL AGENT BM, FERRARI, HAMPTON and other defendants directly encouraged the adoption of the use of force, rather than the appropriate and civil legal remedies recommended by lawyers for HARNEY COUNTY, STATE OF OREGON and the UNITED STATES as the appropriate steps for resisting and removing adverse possession claimants. Defendants BRETZING, SPECIAL AGENT BM, FERRARI, HAMPTON and other defendants chose the use of excessive force as a deliberate effort to continue the conspiracy, misconduct, aims and objectives of Defendant LOVE, BRETZING and LAURO and other defendants in the BLM and FBI, as identified above.

179.     Defendants LOVE and BRETZING also knew that LOVE kept a "kill book" and also knew that he used his influence within the BLM and with BRETZING and the FBI to intentionally try to bring about physical harm and death to federal government protestors, including specifically by the targeting of Cliven Bundy, Cliven Bundy's family members, and Cliven Bundy's political supporters – which included LaVoy Finicum.

180.     Defendants LOVE and BRETZING also cooperated together to get other defendants and individuals to assist them in their scheme and planning to use force to solve political disagreements and disputes regarding protests over federal government overreach.

181.     BRETZING and other DOJ personnel (including JOHN DOE defendants) also knew that they were furthering the agenda of the rogue faction of government agents that had

been operating under and/or in concert with Defendant LOVE – and were specifically targeting Bundy Family members, LaVoy Finicum, and others in Oregon who had also been participants in Bunkerville, Nevada back in 2014.

182.    Defendant BRETZING also used his position and authority to continue what Agent Wooten uncovered as a "don't ask, don't tell" mentality and approach –to continue disseminating the false media and PR narrative about Cliven Bundy and his supporters, and this continued as the UNITED STATES and the STATE OF OREGON deliberately and knowingly mischaracterized the nature of the Refuge occupation and the aims and objectives of LaVoy Finicum, Ammon Bundy, and other protesters associated with them.

183.    Specifically, in January 2016 defendant BROWN (Governor of Oregon) directly communicated with staff members that they were to work with other JOHN DOE defendants to control the public narrative, including with knowingly false and misleading information. BROWN further prioritized the use of force rather than political and court remedies suggested to her, and she did this by ignoring readily available legal advice that the Refuge occupation by itself was not an illegal activity.

184.    Defendant BRETZING, who was also closely associated with Defendant LOVE, continued to use and advance the false "talking points" used by the DOJ in Bunkerville, to describe what was happening in Oregon, especially as he and other agents under his command (including JOHN DOE defendants) briefed individuals like Chad Karges, the Refuge manager – to advance the false and extremely misleading narrative that LaVoy, the Bundy's and other protestors presented a real physical threat against the safety and well-being of federal government employees.

185.    As such, Defendant BRETZING, deliberately continued a politically biased, anti-

Mormon, anti-Bundy, "punitive and ego driven" agenda of Defendant LOVE – who had openly admitted that it was his goal to exact violence against Cliven Bundy and his supporters.

186.     Further, BRETZING directed those under his command and influence, including other JOHN DOE defendants, to continue Defendant's LOVE's agenda, knowing of Defendant LOVE's misconduct, and knowing that Defendant LOVE had bragged about keeping a "Kill Book" where he claimed responsibility for a growing number of individuals who had died as a result of his leadership in BLM activities.

187.     From January 2 through January 26, 2016, neither LaVoy Finicum nor Ammon Bundy, nor anyone else occupying the Refuge received any eviction or ejectment notice, trespass complaint or any other formal demand by any local, state or federal authority claiming ownership of the Refuge grounds being claimed by the occupiers.

188.     Further, what came to light in the 2016 federal criminal trial of Ammon Bundy, and it is in-fact true that WARD, HARNEY COUNTY, the FBI and the BLM all knew that there was no arrest warrant issued for LaVoy Finicum, Ammon Bundy or any other leader of the Refuge occupation, and that there was no notice given to them that they were breaking state or federal law by staking an adverse possession claim to the Refuge.

189.     Further, throughout January 2016, local, state and federal law enforcement were in regular telephone and face-to-face contact with Ammon Bundy, LaVoy Finicum, Ryan Bundy and other occupiers.

190.     As of January 26, 2016, there was no criminal complaint, no probable cause affidavit, no federal indictments or any other formal proceeding to inform – let alone argue – that LaVoy or any other occupier was being accused of breaking the law.

191.     Yet, as early as the first week in January 2016, FBI agents were targeting LaVoy,

showing his picture to local Burns, Oregon area residents, and identifying him as a "leader" and as a threat to local and state law enforcement, and to residents of Burns, Oregon, all based significantly on the false and misleading information described above.[11]

192.    In addition to targeting LaVoy for violence, Defendant UNITED STATES, FBI, BROWN, OSP and the STATE OF ORGEON had intentionally devised a scheme to ambush LaVoy and other occupation leaders, purposefully requesting that a plan be put in place to use force against LaVoy, without any prior notice or legal process. This plan and scheme included the intentional deployment of the plan outside the view of the public, and on an isolated stretch of Oregon state highway were LaVoy and others could not use cell phones and would be isolated from public and political supporters.

193.    The ambush plan was motivated by politics and personal animus. It also involved the knowing and intentional avoidance of advice she had received from legal counsel and from state law enforcement personnel.

194.    The ambush plan also included the enlistment of OSP and the cooperation of

---

[11] Contrary to the public narrative, Defendant WARD met with Ammon Bundy and Ryan Payne on January 7, 2016, several days after the occupation.  WARD acknowledged that he could see positive things developing as a result of the occupation. He also admitted that the protest had successfully gained the attention of congressmen, senators, governors and that the people of Harney County had told him they were excited to see their issues getting attention. Finally, WARD acknowledged that no law was being broken, and expressly informed the occupiers that he agreed no one had been hurt and the only thing that had happened is that "some buildings have been occupied." WARD also admitted he was comfortable meeting with and talking with the occupiers, and that he had "always" felt that way since they arrived in Harney County. WARD also informed the occupiers that their actions were still "on a positive note" and that he was certain that the voices of his citizens were now going to be heard. All this is in contrast to the intentionally false narrative and false talking points WARD, GRASTY, BROWN, BRETZING, and the other defendants described above – were purposefully advancing to accomplish the aims and objectives of Defendant LOVE and Defendant BRETZING and other JOHN DOE defendants who were intentionally planning harm and violence to the Bundys, to LaVoy and to others involved with Bunkerville.

WARD, GRASTY and the FBI, as well as ASTARITA, FERRARI, SPECIAL AGENT BM, TROOPER 1, TROOPER 2, HAMPTON, other JOHN DOE defendants.

195.     The ambush plan also intentionally required the avoidance and deception of Sheriff Palmer and other government and law enforcement personnel who disagreed with (or who BROWN and other defendants judged might disagree with) the planned use of force to solve the protests and adverse possession claim.

196.     The ambush plan also intentionally and willfully involved the circumventing and disregarding of well-established constitutional safeguards, STATE OF OREGON law and policy, and longstanding FBI and OSP policy and protocol.

197.     The ambush plan was based, in significant part, on the acceptance and use of the false threat assessment information, false and misleading profiles of LaVoy and other occupiers, and BROWN an other defendants knew or reasonably should have known that much of the information in these threat assessments and profiles was false and misleading and took no action to correct the information or to ensure that true and accurate information was being relied upon.

198.     The ambush plan was adopted in significant part by the FBI and was aided and assisted by the OSP, ASTARITA, FERRARI, SPECIAL AGENT BM, TROOPER 1, TROOPER 2, BRETZING, HAMPTON, WARD, GRASTY, HARNEY COUNTY and other defendants and JOHN DOE defendants.

199.     The adoption of the ambush plan by the FBI and these other defendants, was integral to the plans, schemes and preparations made by the FBI and OSP, which plans, schemes and related operations were implemented and carried out on January 26, 2016.

## STATEMENT OF FACTS

*PLANNING & IMPLEMENTATION (JANUARY 26, 2016)*

200.     On January 26, 2016, Ammon Bundy, Ryan Bundy, LaVoy Finicum and a few other Refuge occupiers had been invited by citizens of Grant County, Oregon (situated just north of Burns, Oregon and Harney County, OR) to give a public presentation on land rights, the Refuge occupation, etc.

201.     Grant County Sheriff Glenn E. Palmer had previously met with the occupiers and had publicly called them patriots.  He had also announced that he intended to be at the public gathering scheduled for January 26, 2016.

202.     Through the use of confidential informants, and through other means, the FBI and OSP received information that LaVoy and other individuals involved in the political protest at the Malheur National Wildlife Refuge would be traveling from the Refuge, along Oregon state Highway 395, to the town of John Day, Oregon, situated about 2 miles north of Canyon City in Grant County, Oregon just off highway 395.

203.     Late in the afternoon, LaVoy left the Refuge driving his personal pick-up, and carrying passengers Ryan Bundy, Shawna Cox, Ryan Payne and Victoria Sharp – headed to the planned event in John Day.

204.     At the same time, a separate vehicle driven by a government informant Mark McConnell, traveled behind LaVoy, carrying passengers Ammon Bundy, and Brian Cavalier. The FBI and OSP including its officers and agents named herein as defendnats, had been informed of both vehicles, the expected time of departure, and the occupants of each vehicle.

205.     Based in significant part on the ambush plan and relying upon the false and deceptive information caused by LOVE, BRETZING, LAURO and CBD, the FBI and OSP deliberately planned a lethal ambush along an isolated stretch of Highway 395, approximately 19 miles north of Burns, Oregon.

206.     The location of the planned government intervention and employment of a Deadman's roadblock was specifically chosen by the above-referenced Defendants, including specifically by BROWN, BRETZING, ASTARITA, FERRARI, SPECIAL AGENT BM, TROOPER 1, TROOPER 2, HAMPTON, the FBI and the OSP, to avoid public scrutiny, to avoid LaVoy being able to use a cell-phone to call for help, and to avoid resistance and involvement from Sheriff Palmer and other government officials who disagreed with BROWN, BRETZING, and other defendants.

207.     Further, the location of the planned Deadman's roadblock was moved from a previously designated spot of the planned operation, despite warnings and admonitions to BROWN, BRETZING and other defendants that moving the planned operation and employing the use of the roadblock, as it was designed, would decrease the safety and increase the complications and risks to all involved.

208.     In furtherance of the above-described schemes and plans, the UNITED STATES and the STATE OF OREGON, through its law enforcement divisions and personnel, planned and executed a two-stage operation with the primary and foremost objective being to prevent LaVoy and those traveling with him from crossing county lines, from reaching Sheriff Palmer and from building political support in John Day, by spreading their message.

209.     Defendants BRETZING, BROWN, WARD, GRASTY, ASTARITA, FERRARI, SPECIAL AGENT BM, TROOPER 1, TROOPER 2, HAMPTON, and other JOHN DOE defendants supported the plan, and in offering their support and assistance knew about the planned "traffic stop" and the pre-planned use of excessive force and how the use of a Deadman's roadblock in this circumstance, accompanied with pre-positioned FBI and OSP snipers and marksmen, was a direct violation of known constitutional safeguards and limitations,

and federal and state guidelines, policies and protocols.

210.     Further, Defendants BRETZING, and BROWN, along with Oregon Senator Wyden collaborated and supported the plan for political purposes, including specifically with the intent to stop the political speech and political association related to the Harney County protests. Senator Wyden, after being briefed on the plan and after giving his support, admitted that the intention of the January 26, 2016 operation was to stop the spreading of the "virus" – meaning, the substance of LaVoy's political speech and the political speech of other protesters such as Ammon and Ryan Bundy.

211.     As the two vehicles traveled on Route 395 in Harney County, in furtherance of illegal aims and objectives described above, and without proper training and supervision, and in violation of known legal and known constitutional duties, unmarked dark SUV vehicles were used by ASTARITA, FERRARI, SPECIAL AGENT BM, TROOPER 1, TROOPER 2, HAMPTON  and other JOHN DOE defendants, to begin the implementation and carrying out of the plan – by first stopping and pulling over the two vehicles once there was no chance that the occupants of the vehicles could have cell service, in what the UNITED STATES has called a "high risk" felony traffic stop.

212.     However, at the time of the "traffic stop", which was accompanied by the use of UNITED STATE'S air surveillance, among other extreme accoutrements of arrest, there was still no arrest warrant, sworn affidavit, or probable cause statement, criminal complaint or indictment against LaVoy or any of the passengers in these vehicles.

213.     In fact, FBI and OSP agents involved in the operation admitted during the criminal trial of Ammon Bundy in 2016, and it is in-fact true that they had been told conflicting reasons and legal grounds for the stop by BRETZING, and other supervisors, and further

admitted that at the time of the stop they could not have identified the specific legal basis for the pre-planned operation or subsequent arrests.

214.     BROWN, WARD and GRASTY along with other defendants, had been specifically advised and informed that no state laws had been broken by the protests and occupation of the Malheur National Wildlife Refuge, and that the federal government had not yet been able to identify any specific federal law that had been broken.

215.     Further, BRETZING, BROWN, and other defendants withheld true facts, details and motivations behind the planned government operation and individually and jointly conspired to spread false information, which they did in fact do, to encourage and facilitate other FBI and OSP officers to carry-out the pre-planned use of force on January 26, 2016.

216.     In fact, the government operation was relying upon representations and assurances from Defendants BRETZING, BROWN, and other defendants – who were deliberately advancing the agenda, narrative and plans of what the UNITED STATES has now uncovered to be the deliberate scheme of a rogue faction of government agents acting to purposefully, wrongfully and/or negligently inflict violence upon Cliven Bundy, his family, and his supporters – including particularly the intentional targeting of politically conservative "Mormons" and others who had been speaking out publicly against the BLM.

217.     LaVoy was among those who were illegally and unconstitutionally pre-targeted by the FBI, OSP, ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2.

218.     Further, Defendants BRETZING, BROWN and WARD all knew that Grant County Sheriff Glenn Palmer had refused to participate in the misconduct, recklessness, constitutional violations and conspiracy described above.

219.     BRETZING, BROWN and WARD all knew this because they had originally been told by their strategic planners that a stretch of road in Grant County would have been a more suitable place for the traffic stop, but under directions and/or input from BROWN and BRETZING and other defendants the location was moved nearer and into WARD's county and jurisdiction – to avoid Sheriff Palmer and to ensure operational secrecy and control.

220.     The FBI and OSP have now admitted that the leaders of the operation intentionally moved the operation to avoid Sheriff Palmer and to rely instead on Defendants WARD and GRASTY's support in the politically motivated plan to use force.

221.     This move was strategic and significant because in Bunkerville, in 2014, this same agenda and several of these same defendants, including specifically BRETZING, the FBI and the BLM had been thwarted in their plans to use violence against the Bundys and other BLM protesters, by the lawful intervention of the local Sheriff, as described above.

222.     Just like LaVoy had previously learned, these defendants knew that bona-fide and unbiased law enforcement would likely de-escalate and prevent the use of force that had been pre-planned as an illicit and impermissible method of resolving political conflict.

223.     Not only had the UNITED STATES and STATE OF ORGEGON (through the FBI, OSP and other defendants described herein) planned the speculated "high risk" traffic stop and warrantless arrests, it had set-up a second stage of the operation with a Deadman's roadblock, were Route 395 was completely blocked, heavily armed agents (including Defendants ASTARITA, FERRARI, SPECIAL AGENT BM, TROOPER 1, TROOPER 2, and other FBI and OSP officers - were strategically positioned behind the roadblock, and some were placed as surreptitious snipers hiding in the trees alongside the road.

# STATEMENT OF FACTS

## *DEADMAN'S ROADBLOCK (JANUARY 26, 2016)*

224.     In setting up the stop and in deploying a Deadman's roadblock in this manner, the FBI, OSP, along with Defendants BROWN, BRETZING, ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2 and others, intentionally set-up and carried out a strategic war-like ambush – designed in advance to inflict violence, through the use of lethal force, in furtherance of the corrupt aims, objectives and misconduct described above, and in furtherance of the conspiracy described throughout this complaint.

225.     Alternatively, Defendants BROWN, BRETZING, ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON TROOPER 1, TROOPER 2, and other defendants, acted wrongfully and with significant negligence in setting up and establishing the Deadman's roadblock and employing the plan and carrying out the activities of January 26th.

226.     As part of carrying out a pre-planned assault, the FBI and OSP engaged and stopped the vehicle with McConnell, Ammon Bundy and Brian Cavalier.  These individuals were arrested without incident, except that McConnell, who was a government informant and the only occupant of the vehicle with a firearm, was not arrested or subsequently charged.

227.     As part of carrying out a pre-planned assault, the FBI and OSP (including ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2 engaged and stopped LaVoy's truck.

228.     It was a surprise to the FBI and OSP (including ASTARITA, FERRARI, SPECIAL AGENT BM, TROOPER 1, TROOPER 2) that passenger Victoria Sharp was in LaVoy's truck, as that was new information not first conveyed to the FBI and OSP by its informants, and this new information caused the FBI and OSP to temporarily reconsider its

preplanned use of force against LaVoy, Ryan Payne, Ryan Bundy and Shawna Cox.

229.     Almost immediately after LaVoy slowed down and stopped his truck, and prior to the FBI and OSP identifying themselves, passenger Ryan Payne rolled down his window and attempted to communicate with FBI and OSP officers.

230.     As part of a pre-planned assault against LaVoy, the FBI and/or OSP fired upon the truck. The FBI and OSP claim that the shot fired was a non-lethal 40mm plastic-tipped round of pepper spray.

231.     The firing of shots at LaVoy's truck was unprovoked.

232.     FBI and OSP officers knew that LaVoy had no way of knowing that the shot was a non-lethal round and fired, as part of the pre-planned operation, intending to provoke a violent response from LaVoy and /or any other passenger in the truck.

233.     After the first shot, Ryan Payne exited LaVoy's truck and was taken into custody.

234.     The firing at LaVoy's truck caused LaVoy, Ryan Bundy, Shawna Cox and Victoria Sharp to reasonably fear for their safety, and no information had been provided to LaVoy, Ryan Bundy, Shawna Cox and Victoria Sharp regarding who was shooting and why.

235.     LaVoy and Ryan Bundy began yelling out the window, communicating with the FBI and OSP and other defendants named above, including John Doe defendants.

236.     During this communication LaVoy was never informed that there was a roadblock ahead. However, during the communication LaVoy repeatedly and clearly told the men pointing weapons at him that he was going to continue travelling until he could get to Grant County and meet Sheriff Palmer.

237.     LaVoy invited those who had stopped him to follow him to Grant County and to discuss any issues they had with Sheriff Palmer.

238.     Without explanation to LaVoy or other passengers, OSP and the FBI demanded that LaVoy and the passengers in the truck surrender. It was unclear to LaVoy, for a large portion of the time, who the officers were that had pulled him over.

239.     After the officers claimed to be from the OSP, LaVoy explained that he was not going to surrender, and that instead he was going to continue traveling to Grant County, to meet with Sheriff Palmer.

240.     At this point, there was no credible information possessed by law enforcement that LaVoy or any of the passengers posed a significant threat to any person or to any property.

241.     At this point in time, there was no credible information that justified the use of lethal force against LaVoy or any of the occupants of the vehicle he was driving.

242.     Nevertheless, LaVoy knew that at this point he had been pulled over by unmarked vehicles, by heavily armed men claiming to be legitimate law enforcement, but who had also fired upon him and his truck, completely unprovoked.

243.     LaVoy and the FBI also had previous experience with federal officers confronting similar government protests at Bunkerville in 2014, and both LaVoy and the FBI had a reasonable basis to believe that the intervention of the county Sheriff could be helpful and could increase the safety of all involved.

244.     At some point during the "traffic stop" both Shawna Cox and Ryan Bundy began using their phones to record as much of the encounter as possible.

245.     Those recordings are in the possession of the OSP, the FBI and other government officials. They are also widely available on social media sites like YouTube and Facebook.

246.     Approximately seven minutes into the "traffic stop" LaVoy drove away.

247.     Originally included as a John Doe defendant, **Defendant Michael Ferrari**

("FERRARI") was an agent of the United States Federal Bureau of Investigation HRT team acting under color of law and within the scope of his employment; separately but in conjunction with his acts under the color of law and within the scope of his employment, this defendant acted – as described herein - with malicious purpose, in bad faith or in a wanton or reckless manner in a manner so as to expose him to personal liability for his actions.

248.    In furtherance of the unlawful aims, unlawful and unconstitutional conduct, and other wrongful acts described herein, TROOPER 1 and TROOPER 2 revealed that Defendants involved, including FBI, OSP, and TROOPER 1 and TROOPER 2  had planned in advance to kill LaVoy Finicum, and made statements on their two-way radio, after LaVoy Finicum announced his plan to reach Sherriff Palmer, "we're going to have to kill this guy."

249.    About a mile later (while being pursued by the OSP, the FBI and other defendants and JOHN DOE defendants), LaVoy rounded a bend in the road and encountered a Deadman's roadblock.

250.    The roadblock had been strategically placed so as to prevent it from being visible until impact was a near certainty for any vehicle traveling at posted speeds.

251.    The method and manner of using, setting up and deploying the roadblock was in violation of OSP and FBI policy, and in violation of known constitutional duties by UNITED STATES, FBI, OSP, STATE OF OREGON, BROWN, ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2.

252.    The method and manner of using, setting up and deploying the roadblock was also the result of a failure to train and/or failure to supervise by UNITED STATES, FBI, BRETZING, ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, and TROOPER 2.

253.    At the site of a government initiated "Deadman's roadblock"[12] Oregon, FBI HRT and OSP SWAT officers (including ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2) fired at least five preliminary lethal shots at LaVoy, as his truck approached, as he was braking, as he was serving to miss the roadblock, and as his truck was coming to a stop.

254.    The firing of these preliminary shots, with lethal rounds, was unprovoked.

255.    The preliminary shots came after other, unprovoked shots fired by OSP and/or FBI agents at the earlier traffic stop and as LaVoy drove away from the prior traffic stop.

256.    The preliminary lethal rounds, fired as LaVoy's truck came to a stop at the Deadman's roadblock on Highway 395, included two shots fired by JOHN DOE officers and/or ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2.

257.    These lethal rounds fired by FBI and OSP officers and/or by ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2, were fired as LaVoy voluntarily exited his truck, with his hands up in the air, in a non-violent, non-confrontational surrender position.

258.    Again unprovoked, OSP and/or FBI and other defendants (including ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2) and JOHN DOE defendants fired lethal rounds at LaVoy and at LaVoy's truck.

259.    Video produced by government surveillance, and subsequently distributed to the public shows, and it is in-fact true that upon first seeing the roadblock, LaVoy immediately braked, and repeatedly attempted to slow down his vehicle.

---

[12] The United States Supreme Court has provided a description and related discussion of what constitutions a "deadman's roadblock" in *Brower v. Inyo County*, 489 U.S. 593, 594 (1989).

260.     LaVoy was physically unable to avoid the Deadman's roadblock and ambush, but successfully and intentionally steered off the road to avoid hitting the road block, and LaVoy also avoided hitting any law enforcement personnel – including at least one law enforcement officer who deliberately jumped in front of his truck.

## STATEMENT OF FACTS

### *MURDER OF LAVOY (JANUARY 26, 2016)*

261.     The OSP, the FBI, ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2 other defendants and certain JOHN DOE defendants clearly had the element of surprise, and had designed the roadblock and participated therein, knowing and taking advantage of the element of surprise.

262.     Nevertheless, OSP and the FBI, as well as ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2 and several JOHN DOE defendants fired multiple lethal rounds at and into LaVoy's truck as it approached the roadblock, even though it was visibly maneuvering to avoid collision.

263.     The firing of these lethal rounds was part of the pre-planned operation.

264.     The firing of these lethal rounds was designed, in part, to intentionally provoke a violent response from LaVoy and/or those traveling with him in the truck.

265.     In fact, after LaVoy's truck had come to a complete stop on the side of the road, in deep snow, buried deep and obviously immobile – the OSP and the FBI, as well Defendants ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2 and other John Doe defendants fired additional lethal rounds at LaVoy.

266.     Almost immediately upon impact in the snowbank, LaVoy intentionally exited the truck in an apparent attempt to draw away the lethal fire, vocally expressing and shouting that he

realized he was being targeted for assassination.

267.     As LaVoy exited the driver side door, with his hands in the air, OSP and/or FBI agents (including ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2) fired at LaVoy, entirely unprovoked and without lawful justification.

268.     Specifically, as LaVoy exited his truck, and after prior shots fired by ASTARITA, FERRARI, SPECIAL AGENT BM, TROOPER 1 and/or TROOPER 2, ASTARITA and/or FERRARI, and/or SPECIAL AGENT BM, and/or HAMPTON, and/or TROOPER 1, and/or TROOPER 2 fired two lethal rounds intending to kill LaVoy as he attempted to surrender with his hands above his head.

269.     These two shots missed LaVoy.

270.     Following these missed shots, LaVoy began walking through the snow and away from his truck, and repeatedly raised his arms into a surrender position.

271.     As LaVoy walked through the snow, an OSP SWAT trooper who had been strategically pre-positioned as a sniper along the tree line, about twenty-feet back from the highway, emerged and engaged LaVoy with a deployed Taser.

272.     At about the same time, two OSP SWAT troopers (including one who had already fired three lethal shots) approached LaVoy from behind (from the south side of the roadblock) and between the two of them, these JOHN DOE officers, and/or ASTARITA, and/or FERRARI, and/or SPECIAL AGENT BM, and/or HAMPTON, and/or TROOPER 1, and/or TROOPER 2 fired at least three additional lethal rounds, penetrating LaVoy repeatedly through the back.

273.     At the same time LaVoy was walking through the snow, and just before, during and after LaVoy was shot three times in the back, with the continued element of surprise, OSP and FBI officers continued to fire a barrage of lethal and non-lethal rounds at LaVoy and the

truck, and the surreptitiously placed and heavily armed officers in the trees had begun to make themselves visible.

274.     No threats or indications of threats came from the passengers in the truck, yet FBI and BLM officers and other defendants continued to fire upon the truck for almost ten minutes.

275.     During the shooting period, passenger Ryan Bundy was also shot in the arm with a lethal round.

276.     No government agent attended to LaVoy after he was shot in the back with three lethal rounds or attempted to administer aid or relief for at least 10 minutes.

277.     LaVoy died, on the ground, in the snow.

278.     The FBI, the OSP, ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2 and other JOHN DOE defendants left LaVoy dead in the snow for approximately 12 hours, into the next day.

279.     Autopsy results have confirmed, and it is in-fact true that LaVoy was murdered, the cause of death: homicide. All wounds were specified as gunshot entry from the back (posterior left shoulder, left upper back and right lower back.)

## STATEMENT OF FACTS

### *CONSPIRACY AND COVER-UP (JANUARY 26, 2016)*

280.     Since the shooting, the UNITED STATES has admitted, and it is in fact true, that among other efforts designed to conceal the true intentions and motivations of FBI and OSP officers at the scene, and other JOHN DOE defendants responsible for the government's actions on January 26, 216, the FBI and OSP deliberately planned and acted *before the shooting* to hide, prevent, conceal and/or destroy evidence resulting from their actions or that they knew would result from their planned and anticipated actions.

281.     The plans and actions made before the shooting to hide, prevent, conceal and/or destroy evidence included, among other measures, FBI and OSP (including ASTARITA, FERRARI, SPECIAL AGENT BM, HAMPTON, TROOPER 1, TROOPER 2) acting in contravention of known policies, and routine training, e.g. when FBI officers deliberately ordered or otherwise required OSP SWAT officers to remove and/or turn off their standard issue body cameras.

282.     The plans and actions made before the shooting to hide, prevent, conceal and/or destroy evidence included, among other measures, when OSP SWAT officers agreed and complied with FBI officers, and acted to purposefully ensure that no video or audio recordings of the events at the roadblock on January 26, 2016, would be recorded from the ground.

283.     Since the shooting on January 26, 2016, the UNITED STATES has admitted, and it is in fact true, that among other efforts designed to conceal the truth of what actually took place on February 26, 2016, the FBI and OSP (along with other defendants) acted with forethought and deliberately planned and acted *after the shooting* to conceal, destroy and alter evidence of what took place in the lead up to January 26, and regarding the true facts and details surrounding the shooting and murder of LaVoy.

284.     The FBI, the OSP and other defendants have publicly defended the deliberate ambush and murder of LaVoy on January 26, 2016, by alleging that after he exited his vehicle, and after he had been shot at with at least five lethal rounds (as well as an additional unknown number of non-lethal rounds), and after he had repeatedly placed his hands above his head in a surrender position; that he appeared to be reaching into his jacket.

285.     According to the FBI and the OSP, LaVoy's apparent *reaching action* constituted provocation, caused certain FBI and OSP officers to fear for their safety or the safety of others,

and served as justification for using lethal force, and for shooting LaVoy three times in the back.

286.    Statements made by the FBI and the OSP, including by several above-named defendants, to the effect that FBI and OSP officers feared for their safety or the safety of others, and served as justification for using lethal force, were false statements, and were made by defendants who knew the statements were false, and who made such statements intending to cover-up and falsify facts and details of what actually took place in the lead up to, and execution of the Deadman's roadblock on Highway 395 on January 26, 2016 and other events that continued after events, actions, choices and plans of the OSP and FBI on January 26, 2016.

287.    In further support of these false allegations and in defense of the shooting, the FBI, the OSP and other defendants – including HAMPTON, claim that a loaded handgun was found in an inside pocket of the denim jacket LaVoy was wearing at the time the was killed.

288.    LaVoy normally kept that firearm or a similar handgun along with related ammunition, safely secured in a specific location in his pick-up, not on his person.

289.    Evidence in possession of the FBI, and the OSP and other defendants appears to confirm that the handgun at issue was stored in its normal position in LaVoy's truck, during the events of January 26, 2016, and as a result neither the handgun nor the handgun's ammunition was located in LaVoy's pocket or any other place on his person, when he exited his truck.

290.    After LaVoy was murdered, his body was left to lay in the snow, on the side of the road, for approximately twelve hours – from about 4:40 PM until after 4:30 AM the next day.

291.    From the time of LaVoy's murder at about 4:40 PM, until sometime after 1:12 AM, the following occurred:

292.    Law enforcement officers, approximately 10 minutes after the shooting, visually inspected LaVoy's body as it lay in the snow, to confirm that he was dead.

293.     Additionally, after 4:40 PM, but before crime scene investigators arrived, one or more law enforcement officers briefly attended to LaVoy's body, and surveyed his body and the surroundings, including a preliminary safety and threat check to ensure the safety of all other individuals at the scene.

294.     These same officers, in the process of doing safety and threat check, maneuvered and manipulated LaVoy's upper body, including his arms and the denim jacket he was wearing, to place hand-cuffs on LaVoy's body, restraining his arms at the wrist level, behind his back.

295.     Additionally, after 4:40 PM and before 1:30 AM, medical personnel, EMTs and/or paramedics also briefly attended to LaVoy's body and removed or displaced clothing on his upper body to, among other reasons, place "leads" on his body to verify he was deceased.[13]

296.     However, from 4:40 PM to sometimes after 1:12 AM, not one individual, not one FBI officer and not a single OSP officer reported seeing or finding a firearm on or near LaVoy's body, and no one reported finding any ammunition.

297.     None of the law enforcement officers who were present on the scene from 4:40 PM, and none of the medical personnel, EMTs and/or paramedics who physically handled LaVoy and inspected his body reported seeing, discovering, or encountering a firearm on LaVoy's body despite all of these individuals being involved in visually inspecting, securing, and handling LaVoy's body, including his upper body, and maneuvering, *inter alia*, LaVoy's denim jacket.

_____

[13] The purpose of placing the leads was presumably to detect possible electrical signals generated by heart muscle depolarizations, which propagate in pulsating electrical waves towards the skin. Although the electricity amount is in fact very small, it can be picked up reliably with ECG electrodes attached to the skin and connected to a medical device. ECG "leads" or electrodes are typically wet sensors, requiring the use of a conductive gel to increase conductivity between skin and electrodes.

298.     It was not until after 1:30 AM on January 27, 2016, and after dozens of OSP, FBI

and other individuals had unsupervised, unmonitored and unrecorded access to the crime scene

and specifically to LaVoy's body and LaVoy's truck, and after several government agents had

the opportunity to review the aerial video surveillance of the incident, that OSP forensic officer

Tori Dickerson found and identified, for the first time, the handgun and ammunition alleged to

have been in LaVoy's denim jacket at the time of the shooting.

299.     Further, unbeknownst to the dozen or more FBI and OSP law enforcement

officers on the scene from 4:40 PM until at least 1:12 AM, aerial video reconnaissance continued

well after dark, including using night vision and IR imaging to record activity and events on the

ground, surrounding LaVoy's dead body, LaVoy's truck, and the roadway at and around the

place of the Deadman's roadblock.

300.     The aerial video reconnaissance shows, subsequent sworn testimony from FBI

and OSP officers describe, and it is in-fact true, that several FBI and/or OSP officers approached

LaVoy's truck, after dark and on repeated and multiple occasions opened the driver's side door,

and in some instances placed and removed evidence from in, on and/or around LaVoy's truck.

301.     The FBI and/or OSP officers who, in the dark and without making

contemporaneous records, and prior to the crime scene investigation staff arriving, placed and

removed evidence from in, on and/or around LaVoy's truck did so without any legitimate law

enforcement or government purpose.

302.     The placing and removing of evidence from in, on and/or around LaVoy's truck

was part of deliberate efforts to hide evidence, to destroy evidence and to manufacture evidence,

so as to obscure the true facts from what happened at the site of the Deadman's roadblock on

January 26, 2016.

303.    Further, as investigators with the Deschutes County Sheriff's Office (who were assigned to process the scene of the shooting), were accounting for the known sets of shots fired by the FBI and/or OSP officers during the Deadman's roadblock (including the shots that apparently killed LaVoy and other shots that struck his vehicle or missed both him and the truck) investigators discovered, among other things, a bullet that struck the roof of LaVoy's truck at a different trajectory than expected.

304.    After ascertaining that there were additional shots fired that FBI and/or OSP officers had failed to disclose at the time, and confirming bullet's existence by comparing the evidence with cell phone video taken by either Shawna Cox or Ryan Bundy, Deschutes County officers and investigators and subsequently investigators from the Department of Justice, modeled and mapped the bullet's trajectory using computers, and other methods, and determined that the bullet was fired from the direction where two FBI agents had been standing.

305.    FBI and OSP and officers of FBI and OSP, including ASTARITA, FERRARI, HAMPTON, SPECIAL AGENT BM, TROOPER 1 and TROOPER 2, acted so as to conceal and hide evidence from the scene of LaVoy's death.

306.    The aerial video reconnaissance described above, also shows, and subsequent sworn testimony from FBI and OSP officers describe, and it is in-fact true, that several FBI and/or OSP officers stayed at the crime scene, milled around, and in the middle of the dark, used flash lights assisted each other in finding, concealing, tampering with and obfuscating evidence at and around LaVoy's truck, and other vehicles at Deadman's road block, and they did this after dark and on repeated and multiple occasions without documenting what they found, what they did to evidence, and concealing or hiding the truth of what they did do.

307.    FBI Agents, including defendants named herein, also all told investigators that

none of them fired a shot during the incident.

308.     However, the statements by the FBI agents were false and misleading and were part of a scheme and cooperation with BRETZING and ASTARITA, FERRARI, HAMPTON, SPECIAL AGENT BM, TROOPER 1, TROOPER 2 and other defendants and JOHN DOE defendants to hide and cover-up their pre-planned aim of provoking a violent response, and the details surrounding actions they took in furtherance of this plan.

309.     As with the post-Bunkerville investigation, it now turns out that all of this was part of a scheme of lies. OSP and FBI agents, including JOHN DOE defendants purposefully and intentionally hid evidence and interfered with investigators' ability to find the truth.

310.     Also, during initial processing of the scene, the rifle cartridge casings fired by at least one FBI and/or OSP agent was reported not present. However, an OSP officer later described seeing two casings at the scene near where the FBI agents were positioned.

311.     FBI aerial and night vision surveillance video shows, and it is in-fact true that agents surreptitiously searched the area in the dark when they were unaware their activities were being recorded, and further they huddled together before breaking up moments later, with one agent bending over twice to pick up unknown objects.

312.     On May 12, 2016, more than a dozen Arizona elected officials and prior elected officials wrote a letter to Defendant BROWN and asked her and the STATE OF OREGON to conduct a more transparent and thorough investigation into the roadside execution of LaVoy Finicum on January 26, 2016. In furtherance of her illicit efforts, her involvement in the above described plans and schemes, and in furtherance of her wrongful conduct, she has refused.

313.     After the acquittal of Ammon Bundy, Ryan Bundy, Ryan Payne, Shawna Cox, Neil Wampler, Jeff Banta and David Fry, in October 2016 in the federal district court, District of

Oregon, several similar requests to investigate what took place, including the dissemination of false and inflammatory information about LaVoy and other protesters, and the preplanned use of force to resolve political conflict, were made to Defendants BROWN, the FBI and the BLM, by elected officials, public organizations and private attorneys. To date, all have refused or have failed to make the information and conclusions from such investigations known to Plaintiffs.

**FIRST CAUSE OF ACTION**
**(Wrongful Death – Federal Tort Claims Act)**
**(Against The United States of America)**

314.     Plaintiffs allege all preceding and subsequent paragraphs here, as if fully set forth and for full incorporation here.

315.     Defendant UNITED STATES is liable to Plaintiffs because officers, agents, and employees of the FBI, employees of the BLM, and other employees, agents or officers of the UNITED STATES , along with others, caused LaVoy Finicum's wrongful death by the acts and omissions described herein.

316.     At all material times hereto, the agents of the UNITED STATES worked within the scope of their employment.

317.     Defendants LOVE, BRETZING, LAURO, ASTARITA, SPECIAL AGENT BM, FERRARI and other JOHN DOE defendants, acted individually, together and jointly, and in so doing violated both the Fourth and Fifth Amendment resulting in the death of LaVoy Finicum.

318.     None of these defendants intervened to prevent the wrongful acts described herein, though able. These wrongful acts, individually and combined, are sufficient legal cause of the wrongful death of LaVoy Finicum to create liability for the UNITED STATES and to justify this cause of action.

319.     The UNITED STATES, if a private person, would be liable to Plaintiffs for the

acts and omissions of its employees, officers, and agents under the law of the place where said acts and omissions occurred, to wit, under common law tort claims for wrongful death, negligent hiring, supervision and retention of agents and employees.

320.     These defendants knew the Defendant LOVE, BRETZING and were unfit to serve as sworn law enforcement and/or government officers when hired and when assigned to the cases and matters described and relevant herein and the UNITED STATES failed to terminate these officers and agents until after the tragic shooting death of LaVoy Finicum, which death Defendants caused.

321.     The wrongful acts and omission of the Defendant UNITED STATES caused injury and death to the Decedent and harm to his estate and survivors.

322.     As a direct and foreseeable result of the respective negligent and careless acts and omissions of Defendants, including specifically the UNITED STATES by and through its officers and agents described herein, Decedent LaVoy Finicum suffered injury and death.

323.     As a direct and foreseeable result of the respective intentional wrongful acts of Defendants, including specifically the UNITED STATES by and through its officers and agents as outlined herein, Decedent suffered injury and death.

324.     Decedent left Plaintiffs as lawful survivors under relevant law.

325.     Decedent's survivors, Plaintiffs herein, suffered emotional and economic damages as a result of his death, at the time, now and into the future.

326.     Decedent LaVoy Finicum suffered wrongful death by virtue of the UNITED STATE's actions, practices, plans, conduct and policies in this regard. Decedent's survivors and Plaintiffs herein, sustained and continue to sustain damages for lost companionship, support and for mental pain and suffering.

327.     Plaintiff Jeanette Finicum also seeks damages as the Personal Representative of Descendent LaVoy Finicum's estate for past and future medical and funeral expenses and lost earnings and lost value to his assets and estate.

328.     Plaintiffs timely submitted an administrative claim to the FBI and to the United States Department of Justice.

329.     The UNITED STATES failed to make a final disposition of the claims within six months and the claimants have elected to deem them denied.

WHEREFORE, Plaintiffs seek compensatory and punitive damages and costs against Defendant UNITED STATES, and such other relief as justice may require.

## SECOND CAUSE OF ACTION
**(Bivens Action – Fourth and Fifth Amendment)**
**(Against all Federal Agents, Employees, Officers)**

330.     Plaintiffs allege all preceding and subsequent paragraphs here, as if fully set forth and for full incorporation here.

331.     Plaintiffs are entitled to relief against all defendants named herein who are federal agents, employees or officers, because they individually and together violated LaVoy Finicum's Fifth Amendment Due Process rights (e.g. false statements, conspiracy, misconduct, labeling as domestic terrorist, false attribution of threats, etc.) and Fourth Amendment rights (e.g. excessive and unlawful and unnecessary force, illegal seizure via the use of a Deadman's roadblock and related manifestations and uses of force, etc.).

332.     These defendants used deadly force against LaVoy Finicum without justification and without any threat of serious harm to any person.

333.     The conduct of these defendants described herein, and their related and linked use of unjustified deadly force constituted a battery on Mr. Finicum, which conduct led to his

wrongful death under Oregon law and other relevant law.

334.     As a result of the wrongful acts of these defendants, the estate and survivors of

LaVoy Finicum have suffered harm as described herein.

WHEREFORE, Plaintiffs seek damages as noted.

**THIRD CAUSE OF ACTION**
**(42 U.S.C. § 1983 – Excessive Force)**
**(Against the Individual Defendants, In Their Individual Capacity)**

335.      Plaintiffs allege all preceding and subsequent paragraphs here, as if fully set

forth and for full incorporation here.

336.     Plaintiffs are entitled to relief against all of the defendants named in this suit,

because they violated state and constitutional law causing LaVoy Finicum's death.

337.     All of the individual defendants (excluding the CENTER FOR BIOLOGICAL

DIVERSITY) acted under color of law or lawful authority and power.

338.     The CENTER FOR BIOLOGICAL DIVERSITY cooperated with and acted

under the plans and schemes of the UNITED STATES, and purported to act, complain, gather

information and disseminate information as an agent of the UNITED STATES in the lead up to

events in Bunkerville, NV, and after April 2014 related to the threat assessment information

gathered and maintained and disseminated by the UNITED STATES.

339.     These defendants acted jointly and collectively with each other in the wrongful

acts leading to the death of LaVoy Finicum.

340.     Each of these defendants failed to intervene to prevent abuse and harm to LaVoy,

though able.

341.     As a result of the wrongful acts of these defendants, the estate and survivors of

LaVoy Finicum suffered harm as described herein.

342.     Plaintiffs have also suffered the cost of legal services.

WHEREFORE, Plaintiffs seek relief as noted.

## FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – Deprivation)
### (Against the Individual Defendants, In Their Individual Capacity)

343.     Plaintiffs allege all preceding and subsequent paragraphs here, as if fully set forth and for full incorporation here.

344.     In doing the foregoing wrongful acts, Defendants and each of them, acted in reckless and callous disregard of the constitutional rights of LaVoy Finicum.

345.     The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each defendant in an amount adequate to punish the wrongdoers and independently to deter future misconduct.

346.     Additionally, Defendants, acting under color of state and federal law (excluding the CENTER FOR BIOLOGICIAL DIVERSITY), deprived Plaintiffs of their right to a familial relationship without due process of law by their sue of unjustified and fatal force against LaVoy Finicum with the deliberate intent to cause LaVoy Finicum harm so that he could not and would not return to his family in his home state of Arizona, in violation of rights, privileges, and immunities secured by the First and Fourteenth amendments to the United States Constitution.

347.     As a result of the foregoing wrongful acts of Defendants, and each of them, Plaintiffs sustained general damages, including grief, emotional distress, pain and suffering, loss of comfort and society, and special damages, including loss of support, in and amount according to proof.

348.     As further damage, Plaintiffs have incurred and will continue to incur attorney's fees, and pursuant to 42 U.S.C. ¶ 1988, are entitled to the recovery of costs and fees in pursuing a

violation of 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – *Monell*)
### (Against All Defendants)

349.     Plaintiffs allege all preceding and subsequent paragraphs here, as if fully set forth

and for full incorporation here.

350.     Plaintiffs bring this claim for relief in their capacity as the successors-in-interest

and personal representative of the decedent.

351.     Defendants, and each of them, knowingly and with gross negligence, maintained

permitted and ratified policies and customs which allow the occurrence of the types of wrongs

set forth herein above, all in deliberate indifference to the constitutional rights of citizens.

352.     The FBI, the BLM, the STATE OF OREGON, the OSP, HARNEY COUNTY,

along with Defendants LAURO, LOVE, BRETZING, ASTARITA, FERRARI, HAMPTON and

other individuals and entities continued the employment and/or association with the Defendants

and JOHN DOE defendants described above, and allowed or provided little to no supervision of

these officers, agents or employees, in spite of the fact that these Defendants had prior

complaints for misconduct.

353.     Defendant LOVE (and other JOHN DOE defendants) was known to the UNITED

STATES to be engaged in a pattern of rampant corruption and misconduct, and the government's

own internal investigations reached this same conclusion.  LOVE, and those aligned with and

assisting LOVE and JOHN DOE defendants as described herein, participated in the corruption

described above, which all caused or proximately caused the death of LaVoy Finicum.

354.     The widespread corruption and misconduct described and otherwise identified

herein, included illegal targeting, religious bias and persecution, mishandling and destroying

evidence, pursuing vendettas and purposefully using government resources to harm and inflict

unnecessary violence, and other egregious forms of wrongdoing from April 2014 and through

January 2016 – which allowed and assisted LOVE, BRETZING and other JOHN DOE

defendants in violating state and federal law, and specifically the Fourth and Fifth Amendment,

resulted in the wrongful shooting death of LaVoy Finicum.

355.    The UNITED STATES, the STATE OF OREGON, and HARNEY COUNTY all

acted with deliberate indifference in the training of its law enforcement officers and other agents,

related to the use of reasonable force and lawful seizures, as well as the deliberate indifference

by the relevant government hierarchy to the safety of citizens or the adherence to the

Constitution's protection of individual rights, are the moving force behind the misconduct

engaged in by Defendants.

356.    This widespread corruption, excessive negligence, willful indifference and

misconduct are all factors leading to the shooting death of LaVoy Finicum.

357.    Further the ratification of misconduct by the UNITED STATES, STATE OF

OREGON, BROWN, HARNEY COUNTY, WARD and GRASTY along with the failure to

conduct adequate investigations of misconduct led to the violations of Plaintiffs' and LaVoy

Finicum's constitutional rights.

358.    Based upon the principles set forth in *Monell v. New York City Dept. of Social

Services*, the FBI, the BLM, the STATE OF OREGON, the OSP, and HARNEY COUNTY are

liable for all the injuries sustained by Plaintiffs as set forth above.

359.    Due to the conduct of these defendants, and each of them, Plaintiffs have incurred

and will continue to incur attorneys' fees and are entitled to recovery of said fees pursuant to 42

U.S.C. § 1988.

## SIXTH CAUSE OF ACTION
### (Conspiracy)
### (Against All Defendants)

360.     Plaintiffs allege all preceding and subsequent paragraphs here, as if fully set forth and for full incorporation here.

361.     Plaintiffs are entitled to relief against each and all Defendants because they conspired with each other and together, to cause LaVoy Finicum's harm and ultimate death under *Bivens*, 42 U.S.C. 1983, color of state law, and relevant state common law and statutory authority.

362.     The Defendants, as described above, acted strategically to perpetrate and then cover up their wrong doing.

363.     The Defendants, as described above, knew of the wrongdoing, and each and all of them failed to intervene to prevent harm to LaVoy Finicum, though able.

364.     As a result of this conduct, Plaintiffs have suffered harm as noted above, and are entitled to damages and attorney fees as also noted above.

## Seventh CAUSE OF ACTION
### (Negligence)
### (Against All Defendants)

365.      Plaintiffs re-allege all preceding and subsequent paragraphs here, both as if fully set forth here.

366.     Defendants and each of them owed a duty to the public to properly train and supervise the officers, employees and agents under their control and influence.  They failed to do so.  This led to the untimely and unwarranted death of LaVoy Finicum.

367.     Defendants also owed a duty to LaVoy Finicum, to conduct themselves

reasonably and safely so as not to harm him in the circumstances that occurred.

368.　　　Defendants are liable or their neglect pursuant to Oregon State law.

369.　　　Plaintiffs filed timely claims pursuant to Oregon State law.

370.　　　Plaintiffs are parties with proper standing pursuant to Oregon State law.

371.　　　Plaintiffs are entitled to pursue and obtain the remedies prayed for herein, including for each of them, pecuniary loss and other compensable injuries resulting from the loss of the society, comfort attention services and support of the decedent LaVoy Finicum.

372.　　　The loss of LaVoy Finicum will continue to cause great and severe damages to Plaintiffs, all in an amount according to proof.

373.　　　As a further and direct result of the acts, omissions, negligent conduct, and/or reckless disregard for the safety of LaVoy, by Defendants, and each of them, Plaintiffs have incurred funeral and burial expenses, medical expenses and other incidental costs and expenses in an amount according to proof.

## EIGHTH CAUSE OF ACTION
### (Assault and Battery – Common Law)
### (Against State of Oregon, Hampton, Trooper 1, Trooper 2 and Harney County)

374.　　　Plaintiffs allege all preceding and subsequent paragraphs here, as if fully set forth and for full incorporation here.

375.　　　The STATE OF OREGON, BROWN, OSP, HAMPTON,  TROOPER 1 and TROOPER 2, as well as WARD, GRASTY and HARNEY COUNTY engaged in intentional attempts, plans and conduct to do violence against LaVoy Finicum, coupled with the present ability to carry these intentions into effect.

376.　　　In furtherance of these unlawful aims, unlawful and unconstitutional conduct, and other wrongful acts described herein, TROOPER 1 and TROOPER 2 revealed that Defendants

involved had planned in advance to kill LaVoy Finicum, and made statements on their two-way radio during the events of January 26 described in detail below, after LaVoy Finicum announced his plan to reach Sherriff Palmer, "we're going to have to kill this guy."

377.     These Defendants engaged in voluntary acts that caused intentional harm and contact with LaVoy Finicum, including shooting him three times in the back.

378.     As a direct, proximate and foreseeable result of these actions, LaVoy suffered deprivation of his constitutional rights, injury, harm, pain and suffering, and compensable economic loss.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.  For general damages in an amount according to proof, but no less than $5,000,000 for each plaintiff, but as permitted by law;

2.  For special damages in an amount according to proof; as permitted by law,

3.  For punitive damages against the individual officers, in an amount according to proof and as permitted by law,

4.  For injunctive relief;

5.  For reasonable attorneys' fees and costs where applicable;

6.  For costs of suit herein incurred; and

7.  For such other and further relief as the Court may deem just and proper.

DATED:  September 28, 2018

/s/ J. Morgan Philpot
J. Morgan Philpot, OSB #144811
Attorney for Plaintiffs